5 F.3d 542
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Guadalupe A. MARTINEZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Paul MATA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eduvijes Yanez ROMAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
John Louis RIOS, Defendant-Appellant.
 Nos. 91-10295, 91-10298, 91-10299 and 91-10319.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 11, 1993.
Decided Aug. 26, 1993.
 
 1
 Appeal from the United States District Court Northern District of California; Nos. CR-90-20109-JW, CR-90-20109-02-JN, James Ware, District Judge, Presiding.
 
 
 2
 N.D.Cal.
 
 
 3
 AFFIRMED.
 
 
 4
 MEMORANDUM**
 
 
 5
 Before: SCHROEDER and BRUNETTI, Circuit Judges, and KING*, District Judge.
 
 
 6
 Appellants Paul Mata, John Rios, Guadalupe Martinez, and Eduvijes Roman appeal their jury convictions for federal drug violations. Each of the defendants was convicted of one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 841(a)(1), and one count of conspiracy to possess with the intent to distribute cocaine in violation of 21 U.S.C. Sec. 846. We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm.
 
 I.
 
 7
 The Government charged that the four defendants, together with other persons, conspired to sell, and did attempt to sell 9.8 kilograms of a substance containing a detectable amount of cocaine. Three of the defendants, Rios, Martinez, and Roman, were arrested at the intended point-of-sale on September 9th, 1990. Paul Mata was arrested later that morning at the Reid-Hillview airport. The arrests culminated an intensive undercover investigation lasting some weeks.
 
 II.
 
 8
 Appellants bring several challenges to the trial court proceedings.
 
 A.
 
 9
 Appellants first allege that the district court erred in admitting certain tape-recorded telephone conversations as co-conspirators' statements under Fed.R.Evid. 801(D)(2)(E). In the course of his undercover investigation, officer Miller caused to be recorded on tape several telephone conversations involving people connected with the conspiracy, including Agent Miller himself, James Alexandre, Paul Mata, Keith LNU, and Anthony (Tony) Yllan. Most of the recordings memorialize conversations between James Alexandre and Paul Mata and between Alexandre and Tony Yllan. At a pretrial hearing, the court made a preliminary ruling on whether certain of these tape recordings were admissible as co-conspirators' statements under Fed.R.Evid. 801(D)(2)(E). The district court found the statements admissible.
 
 
 10
 Appellants advance three objections to the district court's finding of admissibility. First, appellants complain that the court did not make a finding that each defendant was a member of the conspiracy at the time the statements were made. [Roman AOB at 22-25, Rios AOB at 20-22].[1] Next, they complain that the court's preliminary finding of admissibility was improper in light of the fact (recognized by the court) that the tapes contained material which was outside the scope of the conspiracy. [Roman AOB at 22, Rios AOB at 23]. Finally, Appellants argue that the district court improperly determined the admissibility of the statements without resort to sufficient extrinsic evidence of the existence of a conspiracy. [Rios AOB at 21].
 
 
 11
 Appellants' first contention is without merit. The district court is not required to make an express finding that the government has established the existence of a conspiracy and the defendants' connection to such a scheme. See United States v. Tamez, 941 F.2d 770, 775 (9th Cir.1991).
 
 
 12
 Appellants' complaint that not all of the statements contained on the tapes were in furtherance of the conspiracy also fails. Appellants do not identify any statements from the recordings which were admitted into evidence but which were not made in the course of and in furtherance of the conspiracy. We are thus provided with no basis upon which to determine whether such statements were in fact admitted, whether such admission was erroneous, or whether any resultant error was other than harmless. Appellants have not demonstrated plain error warranting relief on this ground.[2]
 
 
 13
 Neither have Appellants demonstrated reversible error on their third argument. We review a district court's decision to admit evidence pursuant to the co-conspirators statement exception for abuse of discretion. United States v. Peralta, 941 F.2d 1003, 1006 (9th Cir.1991), cert. denied, 112 S.Ct. 1484 (1992). The district court's predicate findings that a conspiracy in fact existed and that the statements were made "during" and "in furtherance of" the conspiracy, however, are reviewed for clear error. Id. (citations omitted). "In other words, we cannot upset such findings unless the district court could not reasonably have come to that conclusion.' " Id. quoting United States v. Echeverry, 759 F.2d 1451, 1457 (9th Cir.1985).
 
 
 14
 "A statement is not hearsay if ... the statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(D)(2)(E). In order for the district court to find the alleged co-conspirators' statements admissible under 801(D)(2)(E), the government must establish by a preponderance of the evidence (1) the existence of a conspiracy (2) involving the declarant and the nonoffering defendant(s), and (3) that the statement was made during the course of and in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175 (1987). It is clear that the court may consider the challenged hearsay statements themselves in making these determinations. Id. at 180-81. In addition, however, there must be some evidence apart from the statements themselves of the existence of the conspiracy and the defendants' involvement therein. United States v. Gordon, 844 F.2d 1397, 1402 (9th Cir.1988). The government (and the court) cannot rely solely on the content of the challenged statements in making the 801(D)(2)(E) determinations. United States v. Tamez, 941 F.2d 770, 775 (9th Cir.1991).
 
 
 15
 In this case, the court first made a tentative ruling on the admissibility of the tape recorded conversations in a January 24, 1991 pretrial hearing. [RT 1/24/91 Document No. 147, p. 14] The court later made a final reiteration of that ruling finding the statements admissible. [RT 1/24/91 Document No. 147, p. 22].
 
 Our framework is as follows:
 
 16
 Before admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(D)(2)(E), a court must be satisfied that the statement actually falls within the definition of the Rule. There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made "during the course and in furtherance of the conspiracy."
 
 
 17
 Bourjaily, 483 U.S. at 175.
 
 
 18
 Appellants appear to be arguing that this language means that the district court must have before it at the time it makes the 801(D)(2)(E) determination sufficient evidence to support the "preponderance" standard in favor of the government.
 
 
 19
 A closer examination of the language in Bourjaily reveals the flaw in Appellants' argument. Bourjaily reiterated that the court must be satisfied by a preponderance of the evidence as to the foundational elements "[b]efore admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(D)(2)(E). 483 U.S. at 175. The district court did not admit any evidence at the January 24th pretrial hearing. It merely made a preliminary determination that, when offered, the statements would come within the exception for co-conspirators' statements.
 
 
 20
 The tapes were received into evidence on March 26, 1991, after the close of the government's case-in-chief. [RT 3/26/91, Document No. 227 at p. 1514][3] By that time, the court had the benefit of all the evidence presented by the government in making its determination that the preliminary facts (existence of a conspiracy involving nonoffering defendants, and that the statements were made during and in furtherance of the conspiracy) had been proven by a preponderance of the evidence. Because the court had the whole of the government's evidence at its disposal--particularly the testimony of prosecution witnesses Tony Yllan and James Alexandre, who unequivocally implicated all defendants--when it actually admitted the taped co-conspirator statements, we have no basis upon which to conclude that the court's underlying findings of conspiracy were clearly erroneous. Accordingly, we find no abuse of discretion in the admission of the challenged statements.
 
 B.
 
 21
 Appellants next object that the trial court "refused to record sidebar conferences" [Rios AOB at 27]. Because "some prejudice is demonstrated by" this failure to record, Appellants conclude, "reversal is required." [Rios AOB at 29].
 
 
 22
 Appellants' contention that the court "refused" to record sidebar conferences is belied by the record. It is true that the court was unwilling to arrange for the court reporter to transcribe discussions at the bench in the traditional trial manner. Our review of the transcript, however, reveals that this "refusal" by the judge was no more than a statement of the impracticability of conducting "sidebar" discussions in hushed tones involving five lawyers and the judge (and potentially two interpreters as well) which were sufficiently clear and audible for the court reporter to understand, but at the same time sufficiently inaudible that the jury would be unable to hear those discussions. The court stated:
 
 
 23
 I would allow you at any time when we're at the sidebar, if you say, your honor, I'd like to put this on the record, we'll have the court reporter. But the court reporter was not called over for sidebar conferences and will not be called over given the number of attorneys that we have. The only way to do it would be to dismiss the jury and have it be on the record.
 
 
 24
 [RT 3/5/91 Document No. 219 at pp. 95-96]. Far from "refusing" to allow recording of proceedings occurrent outside the jury's perception, the court was informing counsel of how the reporting of such discussion could be performed, stating that:
 
 
 25
 If the subject matter comes up, I will entertain any request to put it on the record and I'll tell you whether we stop at that point and do it or do it after recess.
 
 
 26
 [RT 3/5/91 Document No. 219 at 97]. Finally, the court explained:
 
 
 27
 You can ask for a meeting out of the presence of the jury. We'll leave the jury. It's impossible with four defendants to have a conversation with the jury seated there and whisper tones. That's not effective on the record. You can't do it.
 
 
 28
 [RT 3/5/91 Document No. 219 at p. 98]. Here, the court did not commit the error alleged. Therefore, there are no grounds for reversal on this point.
 
 C.
 
 29
 Appellants claim the district court erred in refusing to disclose the identity of the government's confidential informant Keith LNU, and in failing to examine the informant in camera. They also complain of the court's refusal to disclose the identity of one "Liliana," girlfriend of James Alexandre.
 
 
 30
 Appellants' motion to disclose the identity of the informant Keith LNU was decided pretrial. In the proceedings of January 7, 1991, the court called upon the defendants to make their offer[s] of proof with respect to what, if any, testimony would be elicited from this individual, which would make [his] testimony material, and therefore, require the disclosure of the identity of the informant." [RT 1/7/91, Document No. 146, at p. 125]. After receiving the respective offers, the court took the matter under submission.
 
 
 31
 On January 24, 1991, after an extended dialogue in which Mr. Ellison set forth Mata's theory of the case, and explained what events LNU was a percipient witness to, the court denied the motion to disclose LNU's identity. [RT 1/24/91 at p. 44]. The colloguy between the court and defense counsel Ellison shows that the court did not believe that any information LNU might provide would be material and beneficial to the defense. Even accepting as true the whole of Mata's offer of proof, LNU's projected testimony would not be exculpatory as to any aspect of the offense charged. [RT 1/24/91 at pp. 31-44]. The court apparently did not speak with LNU or examine his records in camera.
 
 
 32
 The issue of the identity of "Liliana" , the girlfriend of James Alexandre, did not come up pretrial. AUSA Matheson objected to a question posed by Mr. Ellison in his cross-examination of Alexandre. Ellison asked Alexandre for the last name of Liliana, who was present, along with Alexandre, Paul Mata, (apparently) Paul Mata's girlfriend, and Tony Yllan at a restaurant meeting where the ten kilogram deal was discussed.[4] (The Peppermill Meeting). [RT 1/24/91, at pp. 369-373, 450]. Not only did defense counsel fail to identify testimony Liliana could give that was material and helpful to the defense, they failed to identify any testimony she could provide at all. Counsel's only "offer" was that Liliana would have her "own perspective" of the peppermill meeting. The court refused to disclose Liliana's identity. [RT 1/24/91, at p. 472].
 
 
 33
 We review a district court's denial of a motion to compel disclosure of an informant's identity for abuse of discretion. United States v. Johnson, 886 F.2d 1120, 1122 (9th Cir.1989), cert. denied, 494 U.S. 1089 (1990). Likewise, a court's decision to deny a defendant's request for an in camera hearing on the question of informant disclosure will not be overturned absent an abuse of discretion. United States v. Fixen, 780 F.2d 1434, 1440 (9th Cir.1986).
 
 
 34
 The government has a limited privilege to withhold the identity of a confidential informant. United States v. Williams, 898 F.2d 1400, 1402 (9th Cir.1990). An informant's confidentiality serves important law enforcement objectives. Roviaro v. United States, 353 U.S. 53, 59 (1957). Determining whether to reveal an informant's identity
 
 
 35
 calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.
 
 
 36
 Id. at 62. Although the informer's privilege must give way when the disclosure of the informant's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause," id. at 60-61, the burden is on the movant to demonstrate the need for disclosure. Johnson, 886 F.2d at 1122. The "mere suspicion that information will prove helpful is insufficient to require disclosure." Id. (citing United States v. Buffington, 815 F.2d 1292, 1299 (9th Cir.1987).
 
 
 37
 Although the district court did not conduct an in camera review of LNU's potential testimony, we have a full flavor of Mata's position in the transcript of Mr. Ellison's offer of proof. Even taking the entire offer as true, Mata did not allege facts which would indicate that disclosure of the informant was "essential to a fair determination of his cause." Johnson, 886 F.2d at 1122 (quoting Roviaro, 353 U.S. at 61). Nor did Appellants show how disclosure would have been "relevant and helpful" to their defense. United States v. Jaramillo-Suarez, 950 F.2d 1378, 1387 (9th Cir.1991). Indeed the defendants' motion to obtain disclosure of the informant "only went to the disclosure of the identity of the informant," rather than to the import of any testimony he might provide. Fixen, 780 F.2d at 1440.
 
 
 38
 It is significant that there was before the district court "no evidence to suggest that the informant was the only percipient witness to any critical event." United States v. Sai Keung Wong, 886 F.2d 252, 256 (9th Cir.1989).[5] The government "largely avoided reference" to LNU's activities and observations in presenting its case, instead relying on the direct observations and testimony of Alexandre and Yllan, who were most directly involved in the transaction.[6] See id. Because LNU's testimony would have been "cumulative and insignificant" in light of the other trial testimony, it cannot be said that the trial court abused its discretion in determining that the public interest in protecting the flow of law enforcement information outweighed identifying the informant in this instance. See id.
 
 
 39
 We have recognized that it is preferable that the trial courts conduct an in camera interview with the informant when making the determination whether to disclose that informant's testimony or identity. See United States v. Ordonez, 737 F.2d 793, 809-10 (9th Cir.1984). Conducting such a hearing and sealing the record for review facilitates our review of the result of the trial court's "balancing" of the competing interests. Indeed, "[w]here an appellate court cannot determine from the record whether the informer's testimony might ensure a fair trial," a reversal is required. Id. at 809 (citing United States v. Fisher, 531 F.2d 783, 788 (5th Cir.1976)).
 
 
 40
 A district court need not, however, conduct such an in camera hearing any time an informant's identity is requested. Fixen, 780 F.2d at 1440. It remains within the court's discretion whether to order such an inquiry. Id. Because the government did not rely on evidence obtained by LNU at trial, and because Appellants did not meet their burden of showing how disclosure would have aided their defense, Appellants were not entitled to an in camera hearing under Roviaro. Jaramillo-Suarez, 950 F.2d at 1387; Fixen, 780 F.2d at 1440. The district therefore did not abuse its discretion in refusing to conduct such a hearing before denying Appellants' motion for disclosure of LNU's identity.
 
 D.
 
 41
 Appellants next complain that the district court erred in failing to grant appellants a new trial based on Tony Yllan's "recanted" testimony. During the jury deliberations, defense counsel presented to the court a transcript of two unsworn, tape recorded statements made by unindicted co-conspirator and cooperating government witness Tony Yllan. [RT 5/8/91, Document No. 215, at p. 5]. In that statement, Yllan claimed that Agent Miller threatened to indict Yllan's wife and put his children in a shelter if Yllan did not cooperate [Martinez ER at p. B-3], and that AUSA Matheson instructed Yllan not to tell the Grand Jury that Alexandre had made threats (against John Rios). [id. at p. B-4].
 
 
 42
 At one point in the transcript, Yllan claimed that Matheson and Keith Miller "coached" Yllan into stating that Paul Mata was involved in the conspiracy when he wasn't in fact involved in the conspiracy. [Id. at B-4, 5]. On what appears to be the second tape, however, Yllan makes the different claim that Mata "wasn't involved after the Peppermill Lounge." [Id. at C-2] (emphasis added), but that before that meeting "he had been involved." [Id. at C-4]. Then on the other side of that same tape, Yllan relates that "[w]e did not know about the ten kilo, well I knew about the ten kilo deal, but Paul didn't know about the ten kilos until a little while after [the August 28th meeting at the house of Ernesto Perez],[7] and then Paul got himself in it. I don't know why, but he did." [Id. at D-8]. Finally, on that same tape, Yllan claimed that nothing he said at trial about Mata was true:
 
 
 43
 "... Everything that I said about my brother-in-law [Mata] is all falsified information that Keith coached me into saying."
 
 
 44
 [Id. at D-6].
 
 
 45
 Yllan's statement also claims that Miller "coached" him into mischaracterizing a statement he made to Alexandre in telephone transcript N-32. According to Yllan, Miller coerced Yllan into saying that "Paul won't be involved this time" meant that Paul wouldn't be involved in future deals, instead of indicating (as Yllan now asserts is true) that Paul wouldn't be involved in future intercourse in this (the ten kilo) deal. [Id. at B-5].
 
 
 46
 Finally, Yllan's statement claims that the reason Paul went to Perez' house on August 28th was to return one ounce of cocaine Perez had "fronted" Paul, not to show a sample of cocaine quality to Alexandre and LNU, as he said in his trial testimony. [Id. at C-2, 6].
 
 
 47
 Defendants made several motions on the basis of Yllan's statement, and they urge several assignments of error herein based upon the court's denial of those motions. Appellants complain of the court's refusal to terminate the jury deliberations and reopen the case to consider the new evidence [Mata AOB at p. 41, Roman AOB at p. 16], the court's refusal to hold an evidentiary hearing concerning the Yllan statements [Rios AOB at p. 42, Mata AOB at p. 46], the court's denial of counsel's motion to recall Yllan as a witness [Martinez AOB at p. 19], and the denial of appellant's motion for new trial or judgment of acquittal based upon the Yllan statements. [Martinez AOB at p. 24, Roman AOB at p. 16, Mata AOB at pp. 41-42]. We deal first with the new trial motion.
 
 
 48
 At the May 8, 1991 hearing on this issue, the court listened to arguments of counsel and indicated that it had reviewed the transcripts of both the "recantation" and of Yllan's relevant trial testimony. The court determined that "although Yllan stated that he had lied, what he later claimed on the tape to be the true events was vague, ambiguous and in many instances consistent with his trial testimony." [Order Denying Defense Motions for New Trial, Rios ER at p. 75]. The court nevertheless took the matter under submission [RT 5/8/91, Document No. 215, at pp. 60, 63], and ruled on the motions by way of a formal, written order. [Order Denying Defense Motions for New Trial, Rios ER at pp. 73-95].
 
 In that order, the court stated that:
 
 49
 Based on defense counsel's representation that Yllan agreed to submit to a polygraph examination, the court established a procedure for the polygraph. Yllan, however, did not consent to such an examination. The court did not order Yllan to testify in post-trial proceedings because, after considering all the evidence presented at trial, including Yllan's trial testimony, and his post-trial statements, the court concluded that Yllan did not commit perjury. In addition, through counsel, Yllan invoked his Fifth Amendment right against self-incrimination.... The court has read and considered Yllan's trial testimony and studied his post-trial statements. In addition, having observed Yllan's testify, [sic] considered the other independent evidence submitted at trial, as set forth in greater detail below, the court finds that Yllan's trial testimony is more credible that his post-trial statements. Moreover, the court finds that Yllan's trial testimony is not contradicted by his vague, ambiguous, and internally inconsistent post-trial statements. Yllan did not commit perjury in his trial testimony. The court finds that a new trial is not warranted because the government did not use perjured testimony nor did it engage in outrageous misconduct.
 
 
 50
 [Order, at pp. 4-5, Rios ER at pp. 76-77]. The court set out in exacting detail the independent evidence of Mata's involvement, and pointed out why Yllan's post-trial statement did not contradict his testimony at trial. [Order, at pp. 8-19, Rios ER at pp. 80-91].
 
 
 51
 Appellants carry a "significant burden" to show that the district court abused its discretion in denying a new trial. United States v. Steel, 759 F.2d 706, 713 (9th Cir.1985). The district court's findings of fact are to be accepted unless clearly erroneous. United States v. Endicott, 869 F.2d 452, 454 (9th Cir.1989). We therefore cannot reverse such findings unless upon review we are "left with a definite and firm conviction that a mistake has been committed." United States v. Ramos, 923 F.2d 1346, 1356 (9th Cir.1991).
 
 
 52
 As part of its Order Denying Defense Motions for a New Trial, the district court found that "the government did not use perjured testimony." [Order, at pp. 5-6, Rios ER at pp. 77-78]. We do not find this conclusion to be clearly erroneous. The court engaged in painstaking review of both the statement and the preceding trial testimony, and its conclusions are well grounded in the record.
 
 
 53
 Because we conclude that this finding is not clearly erroneous, appellants' objections based on the post-trial Yllan statements must be analyzed under the general rubric of "newly discovered evidence." A defendant seeking a new trial based on newly discovered evidence must satisfy the following requirements:
 
 
 54
 (1) It must appear from the motion that the evidence relied on is, in fact, newly discovered, i.e., discovered after the trial;
 
 
 55
 (2) the motion must allege facts from which the court may infer diligence on the part of the movant;
 
 
 56
 (3) the evidence relied on must not be merely cumulative or impeaching;
 
 
 57
 (4) must be material to the issues involved; and
 
 
 58
 (5) must be such as, on a new trial, would probably produce an acquittal.
 
 
 59
 United States v. Cervantes, 542 F.2d 773, 779 (9th Cir.1976) (emphasis supplied) (quoting Pitts v. United States, 263 F.2d 808, 810 (9th Cir.), cert. denied, 360 U.S. 919 (1959).
 
 
 60
 Appellants have failed to make this showing. Even assuming that the statements are (1) newly discovered and (2) indicate diligence on the part of appellants, and (4) are material to the issues involved, appellants have not satisfied inquiries (3) or (5). As to inquiry (3), the statements clearly were "cumulative or impeaching." The court recognized and pointed out in great detail in its order that the statements were overwhelmingly consistent with Yllan's testimony at trial, and therefore would by definition have been cumulative to that testimony. Similarly, the few differences between Yllan's trial testimony and the post-trial statements were instances of inconsistencies--classic vehicles of impeachment. But impeachment is not sufficient.
 
 
 61
 Nor is it apparent that such testimony "would probably have produced an acquittal." Cervantes, 542 F.2d at 779. The court's determination that the "recanted" statements would not affect the verdict supported by substantial independent evidence was not clearly erroneous. We find no abuse of discretion.
 
 E.
 
 62
 Mata and Rios also complain that the district court should have conducted an evidentiary hearing to explore Yllan's claims that AUSA Matheson and Agent Miller improperly influenced his trial testimony. [Rios AOB at p. 42, Mata AOB at p. 46]. Appellants properly moved the court to hold such a hearing [RT 5/8/91, Document No. 215, at p. 42], but the trial court declined.
 
 
 63
 We review the court's decision whether to conduct an evidentiary hearing for abuse of discretion. See United States v. Mejia, 953 F.2d 461, 465 (9th Cir.1991) cert. denied, 112 S.Ct. 1983 (1992). A defendant is entitled to an evidentiary hearing only where he makes "an unrebutted prima facie showing of prosecutorial misconduct that could have prevented a defense witness from giving relevant testimony."[8] United States v. Lord, 711 F.2d 887, 891 (9th Cir.1983). To make a prima facie showing, a defendant must establish (1) that the evidence was relevant and (2) that the prosecution deliberately intended to distort the judicial factfinding process. Id.
 
 
 64
 "To satisfy the first prong of the Lord test, a defendant need not show that the testimony sought was either 'clearly exculpatory' or 'essential to the defense;' the testimony need only be relevant." United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir.1991). In determining whether the Yllan statements would have been relevant to the appellants' defense, we may inquire whether the statements were cumulative, whether they exculpatory, and whether the "substance of the testimony was substantiated by more than the 'unsupported assertion' of appellants." Id.
 
 
 65
 With respect to appellants Rios, Roman and Martinez, the post-trial statements were probably not relevant to their defense. In Yllan's "recantation" he specifically stressed that his testimony other than that involving Mata was true. [Martinez ER at D-6]. The statements could not have been exculpatory as to these defendants.
 
 
 66
 We recognize that the revelation that Yllan "recanted" and "admitted perjury" could have damaged substantially Yllan's credibility, without regard to the content of that recantation. However, the fact that the statements with respect to these defendants had value only as impeachment evidence supports our conclusion that the district court's decision not to grant an evidentiary hearing with respect to these defendants was not an abuse of discretion.
 
 
 67
 As to Mata, the question is more difficult. Yllan's statement both confirms much of his trial testimony concerning Mata and at the same time says that "everything I said about my brother-in-law is all falsified information." [Martinez ER at D-6]. It does seem (as the district court found) that this latter statement is unbelievable. Not only does it conflict with other parts of the same statement, but it appears to be just an overbroad reiteration of the general theme that Yllan was recanting.
 
 
 68
 Yllan's post-trial claim that Mata initially went to the residence of Ernesto Perez to return cocaine which had been "fronted" to him (rather than to provide a sample to Alexandre) is cumulative to the testimony Mata himself gave at trial, and is totally non-exculpatory as to Mata. It does affect the determination of when Mata joined the conspiracy (after arriving at Perez' house rather than before), but does nothing to affect the evidence that Mata did in fact join the conspiracy charged.
 
 
 69
 Yllan's claim that the government told him not to testify to the threats made by Alexandre would not affect the evidence because Yllan did in fact testify to such threats.
 
 
 70
 Yllan's statement that Mata was not involved in the conspiracy after the Peppermill meeting also does not help Mata. Not only is the claim belied by the taped phone conversations between Mata and Alexandre; even if the jury believed Mata was in fact ousted from the conspiracy, he would remain responsible for the conspiracy's subsequent illegal acts. Withdrawal from a conspiracy must come from affirmative action by Mata, no one else.
 
 
 71
 Withdrawal from a conspiracy requires a disavowal of the conspiracy or an affirmative action that would have defeated the purpose of the conspiracy, or 'definite, decisive and positive' steps to show that the conspirator's disassociation from the conspiracy is sufficient.
 
 
 72
 United States v. Loya, 807 F.2d 1483, 1493 (9th Cir.1987) (quoting United States v. Smith, 623 F.2d 627, 631 (9th Cir.1980)). Yllan's statement was therefore not exculpatory as to Mata. Finally, the substance of Yllan's recantations were not "substantiated by more than the 'unsupported assertion' of appellants." In sum, the unsworn statements were not "relevant" to Mata's defense within the meaning of Lord.
 
 
 73
 Because appellants have not satisfied the first prong of the Lord test, they have failed in their prima facie showing and are not entitled to an evidentiary hearing. See Westerdahl, 945 F.2d at 1083. We need not therefore address the second prong.
 
 F.
 
 74
 Appellants also object that the court refused to reopen the proceedings upon revelation of Yllan's post-trial statements and upon defense counsel's motions. [Rios AOB at p. 39, Roman AOB at p. 16, Mata AOB at pp. 41-42, Martinez AOB at p. 19]. We review the court's decision on whether to reopen a case for abuse of discretion. United States v. Simtob, 901 F.2d 799, 804 (9th Cir.1990). "To the extent that the court's ruling constituted a limitation on cross-examination, it too is reviewed for abuse of discretion." Id. (citing United States v. Benny, 786 F.2d 1410, 1419 (9th Cir.), cert. denied, 479 U.S. 1017 (1986)). "Our inquiry on an appeal asserting abuse of discretion in such matters is whether the court's decision was rendered on a consideration of relevant factors and whether a clear error of judgment has been made." Id. (citing United States v. Campbell, 774 F.2d 354, 356 (9th Cir.1985)).
 
 
 75
 It has long been accepted by this court that reopening a case during jury deliberations to admit additional evidence must be undertaken with "extreme reluctance" as a result of the "undue emphasis given to the introduced evidence with consequent distortion of the evidence as a whole and the possibility that such prejudice will result to the other party as to require a mistrial." Eason v. United States, 281 F.2d 818, 822 (9th Cir.1960). This unfair prejudice is relevant to the trial court's decision even though its the defendant who seeks to reopen the matter. As the Supreme Court has stated:
 
 
 76
 The evidence, if put in after four hours of deliberation by the jury, would likely be of distorted importance. It surely would have been prejudicial to the Government, for the District Attorney would then have had no chance to comment on it, summation having been closed ... the court seems to have faced a dilemma, either to grant a mistrial and start the whole case over again or to deny the ... request.
 
 
 77
 Eason, 281 U.S. at 822 (quoting United States v. Bayer, 331 U.S. 532, 538 (1947)).
 
 
 78
 The situation presented in this issue is similar to that posed in United States v. Simtob, supra. In Simtob, the defendant presented his counsel with a tape recording of a phone conversation between the defendant and a primary government witness which the defendant had made after the witness' testimony, but before closing arguments. 901 F.2d at 803. The government witness' credibility was said to be "very much at issue" in the case. Id. After reviewing the conversation, counsel for the appellant appeared in court the following day, prior to final arguments, and discussed the contents of the tape to the court in camera. Id. The offer of proof suggested that the tape featured "evidence of perjury by [the government witness] or at least of inconsistency bearing directly on [his] credibility; he requested permission either to play the tape to the jury or to recall [the defendant] so that he could testify as to the content of [the] conversation." Id. Counsel also suggested, as did counsel on this case, recalling the government witness to cross-examine him further by confronting him with the tape. Id. at 803-04. The court "declined either to listen to the tape in camera, or to have a transcript made until after the argument was over." Id. at 804.
 
 
 79
 This court reversed, finding that the district court's decision was "made without a proper 'consideration of relevant factors,' and constituted an abuse of discretion." Id. Although the situation raised in the instant case is similar, the instruction gleaned from the factors stressed in Simtob points us to the opposite result.
 
 
 80
 The important factors in the Simtob case were three: (1) The government witness involved was the "primary witness" on the issue of predisposition, and whose credibility was very much at issue. (2) Defendant's offer came after the government witness had testified, but before the jury began to deliberate. (3) The court never reviewed the content of the recorded conversation at issue, "even in response to the defendant's post-trial motions for mistrial." Id.
 
 
 81
 With regard to the first factor, our facts do not provide any meaningful distinction. Yllan was one of two witnesses who could be described as "primary" (along with James Alexandre) to the government's case in chief. Yllan provided the most crucial evidence in more than one area of the government's case. As his vigorous cross-examination reveals, his credibility was also the subject of attack.
 
 
 82
 On the second factor, however, this case differs. Here, the evidence did not come to the attention of the court until after the case had been presented, jury instructions given and the jury had begun its deliberations. Unlike Simtob, the risk of distorting the evidence explored in Eason, supra, was squarely presented.
 
 
 83
 It is the third factor, however, which compels a different result--what the court did with the evidence. The Simtob panel reversed the district court because by refusing to examine the tape, the court had "declined to exercise his discretion at all." Id. The court could not have rendered a decision based on a "consideration of relevant factors" because it ignored the most important factor of all--the tape itself.
 
 
 84
 That is not the case here. Upon receipt of the materials, the court undertook a thorough review of the transcript of Yllan's post-trial statements,[9] and compared the "recantations" to the corresponding statements in Yllan's trial testimony. It held a full hearing on the various motions made by defense counsel in response to the statements, including arguments from all counsel. The court "made a order with respect to Mr. Yllan being examined," [RT 5/8/91, Document No. 215, at p. 18], and providing for the administration of a polygraph. [Id. ] [See also Order for Payment of Polygraph Expert, CR Document No. 136, 4/3/91].[10] After the hearing, the court took the matter under submission and rendered a detailed written order.
 
 
 85
 It cannot be said that the court failed in this case to render a decision based upon "a consideration of relevant factors." Nor should it be concluded that the court made a "clear error in judgment" in weighing those relevant factors. The district court's decision not to reopen the case was not an abuse of discretion.
 
 G.
 
 86
 Appellant Martinez objects that the district court's instructing the jury on the theory of entrapment was inconsistent with his defense of "mere presence," and impermissibly misled the jury. This error, he asserts, was so prejudicial as to deny Martinez a fair trial.
 
 
 87
 The trial court informed the jury that "the defendants assert that they were entrapped by the government" and proceeded to instruct the jury on the defense of entrapment. [RT 3/26/91, Document No. 227, at pp. 1600-1602]. Martinez contends that he consistently argued that he was not a part of the conspiracy and that therefore the entrapment instruction, as applied to him, constituted prejudicial error because the instruction presumed his admission of guilt to the conspiracy. [Martinez AOB at pp. 17-19].
 
 
 88
 Generally, this court reviews a jury instruction for abuse of discretion. United States v. Sanchez, 914 F.2d 1355, 1358 (9th Cir.1990), cert. denied, 111 S.Ct. 1626 (1991). However, if a formal, timely, and distinctly stated objection to the instruction is not made, the court reviews for plain error. Id. Finally, if the defendants themselves propose the instruction, then review is totally barred under the invited error doctrine. Benny, 786 F.2d at 1416.
 
 
 89
 Although Martinez did not propose the instruction, he also did not object to it when the judge delivered it to the jury. [RT 3/26/91, Document 227, at pp 1600-1602]. Therefore, we must review the instruction for plain error only. "Plain error is found only in exceptional circumstances, when the error is highly prejudicial, affects substantial rights, and it is highly probable that it materially affected the verdict." Sanchez, 914 F.2d at 1358.
 
 
 90
 The government contends that the entrapment instruction did not prejudice Martinez because this court has held that "a defendant may assert entrapment without being required to concede that he committed the crime charged or any of its elements." United States v. Demma, 523 F.2d 981, 982 (9th Cir.1975). Therefore, argues the government, the entrapment instruction was not inconsistent with Martinez' "mere presence" defense. [Government AOB at p. 44]. However, the Supreme Court has expressly recognized that the two defenses are inconsistent. Mathews v. United States, 485 U.S. 58, 65 (1988). Furthermore, the Demma court itself acknowledged that asserting the two defenses together might seriously erode defendants' credibility:
 
 
 91
 While we hold that a defendant may both deny the acts and other elements necessary to constitute the crime charged and at the same time claim entrapment, the high risks to him make it unlikely as a strategic matter that he will choose to do so.
 
 
 92
 Id. at 985 (emphasis added). See also Mathews, 485 U.S. at 65. Thus, the fact that the two defenses are not legally inconsistent does not mean that asserting the one (entrapment) will not weaken the credibility of the other (mere presence).
 
 
 93
 In this case, the reading of the instruction did not rise to the level of plain error. Viewed in the context of the entire proceeding, it is unlikely that Martinez was highly prejudiced by the court using the inclusive word "defendants" in the course of a rote recitation of printed instructions. In addition, any confusion engendered by the instruction would have been dissipated by defense counsel's closing arguments, which followed immediately the jury instructions and the government's closing. Mr. Ferrito's closing illustrated clearly that Mr. Martinez's defense was not one revolving around entrapment. Viewed in the whole, it is not "highly probable" that the instruction materially affected the jury's verdict, and these are not the "extraordinary circumstances" in which a reversal is indicated.
 
 H.
 
 94
 Appellants maintain the district court erred in giving the model ninth circuit jury instruction on multiple conspiracies instead of the "more comprehensive version" proposed by Mata. They also object to the court's failure to give the requested "specific unanimity instruction." We find no error.
 
 
 95
 The multiple conspiracy instruction given in this case was adequate. In United States v. Loya, 807 F.2d 1483, 1492-93 (9th Cir.1987), we explained that the substantially identical instruction in that case "adequately informed the jury that it could not find a defendant guilty of an uncharged conspiracy even if proved. The failure to instruct further on multiple conspiracies, as requested by the appellants, did not result in prejudicial error." Id. So, too, is the case here.
 
 
 96
 Neither did the court err in failing to deliver the requested unanimity instruction. A general instruction on the requirement of unanimity ordinarily is sufficient to instruct the jury that they must be unanimous on whatever specifications form the basis of the guilty verdict. United States v. Payseno, 782 F.2d 832, 835 (9th Cir.1986). The general instruction given here [RT 1719-1722] was adequate because no ambiguous jury instruction[11], discrepancy between the evidence and the indictment, or other particular factor created in this case "a genuine possibility of juror confusion." Payseno, 782 F.2d at 836, quoting United States v. Frazin & Miller, 780 F.2d 1461, 1468 (9th Cir.), cert. denied, 479 U.S. 839 (1989), and cert. denied, 479 U.S. 844 (1986).
 
 I.
 
 97
 Appellants next complain that the court committed reversible error by unfairly limiting the time available to defense counsel to exercise their peremptory challenges during jury selection. Appellants cite the court's representation to the jury that the process of peremptory strikes "won't take us more than about ten minutes or so," and the prosecutor's subsequent admission that it was a "rapid procedure" in support of this claim. They did not object to the jury selection process, though, until after the jury was chosen and sworn.
 
 
 98
 Neither the number of peremptory challenges afforded a defendant nor the manner in which they may be exercised is constitutionally secured. United States v. Turner, 558 F.2d 535, 538 (9th Cir.1988). The trial court is afforded "wide discretion" in setting the procedure for exercising peremptory challenges. Id.
 
 
 99
 Appellants are correct in reciting that any curtailment on the exercise of peremptory challenges constitutes reversible error. Hines v. Enomoto, 658 F.2d 667, 672 (9th Cir.1981); Turner, 558 F.2d at 538. They have failed, however, to demonstrate that is what happened here. Appellants do not argue that they were prevented from exercising any of their allotted peremptory challenges; they complain only that they had to do so too quickly. This hastening of the process, however, is not the sort of "restriction" contemplated by cases such as Turner, supra.
 
 
 100
 Appellants have not demonstrated why this assertedly "rapid" process was not also a fair one. Invoking the court's statement to the jury on the anticipated length of the process and engaging in post hoc estimates of the total duration of the selection process are insufficient here to demonstrate an abuse of discretion on the part of the court. The objection on this ground is without merit.
 
 J.
 
 101
 Appellants argue the district court erred in denying the defense's request to disclose the informant pay vouchers on informant James Alexandre. Alexandre was questioned on cross-examination regarding how much he was paid by the DEA in connection with his cooperation. [RT 453-56] He testified that he received only partial payment in reimbursement of his expenses in the investigation, amounting to "approximately $500." [RT 453-54]. Upon defense request, the court examined the contents of the DEA file in camera, but refused to open the file to the defense or to seal the file as part of the record on appeal.
 
 
 102
 We review for clear error. United States v. Monroe, 943 F.2d 1007, 1012 (9th Cir.1991), cert. denied, 112 S.Ct. 1585 (1992). Our treatment of this claim is hampered by the district court's refusal to seal the file for our review. With respect to appellants' particular claim, however, the record is sufficient to establish that clear error was not committed.
 
 
 103
 Appellants complain only that the court declined to disclose pay vouchers or records of compensation afforded Alexandre from the DEA file. Our review of the record satisfies us that the jury was provided with sufficient information to assess Alexandre's bias on this basis. See Id. at 1012-13. The nature of Alexandre's agreement was explored on cross-examination, the court released to the defense from the DEA file a document setting forth the conditions for cooperation, and the court apparently discovered nothing else in the file bearing further on the issue of the compensation received by Alexandre. Under these circumstances, we do not find the court's decision balancing the confidentiality of an ongoing investigation against the appellants' specific request for compensation information to be clearly erroneous.
 
 K.
 
 104
 Appellants also claim the district court erred in admitting testimony of prior drug transactions between defendants. We review the court's decision on this point for abuse of discretion. United States v. Sitton, 968 F.2d 947, 958 (9th Cir.1992), cert. denied, 113 S.Ct. 478 (1992), and cert. denied, 113 S.Ct. 1306 (1993).
 
 
 105
 Evidence of other crimes or acts relevant to an issue in the trial may be admitted consistent with FRE 404(b), except "where the evidence proves only the defendant's criminal disposition." United States v. McKoy, 771 F.2d 1207, 1213 (9th Cir.1985) (emphasis in original). Evidence of prior crimes may be relevant in conspiracy cases, for example, "to show the background and development of the conspiracy." Id. at 1214, citing United States v. Nadler, 698 F.2d 995 (9th Cir.1983).
 
 
 106
 We find the testimony challenged herein relevant. The evidence of prior transactions between the charged co-conspirators served both to "explain the nature of the relationship" between the defendants, McKoy, 771 F.2d at 1214, and to impugn the asserted defenses of entrapment and "mere presence" by establishing predisposition between these particular persons to engage in such commerce.
 
 
 107
 Even if relevant, a court cannot admit this type of evidence if its probative value is substantially outweighed by the danger of unfair prejudice. Id. The court's decision in this case that it was not must stand absent an abuse of discretion. United States v. Kessi, 868 F.2d 1097, 1107 (9th Cir.1989). We find no abuse of discretion. Although the statements were certainly prejudicial to appellants, this prejudice cannot be said to have substantially outweighed their probative value in setting the conspiratorial stage for the jury and meeting the defenses of entrapment and mere presence.
 
 L.
 
 108
 Mata and Martinez maintain their convictions should be set aside for insufficiency of the evidence against them. We must determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 109
 Appellant Mata argues that the evidence was insufficient to support his convictions because his "defense of duress was established as a matter of law." The elements of the duress defense are "(1) immediate threat of death or grave bodily harm; (2) well grounded fear that the threat will be carried out; and (3) no reasonable opportunity to escape." United States v. Charmley, 764 F.2d 675, 676 (9th Cir.1985). We find that the evidence, construed in favor of the government, is abundantly sufficient to support the reasonable inference that Mata acted under his own volition.
 
 
 110
 Mata cites two occurrences which he claims establish immediate threat of death or grave bodily harm. The record reveals, however, that neither of these alleged threats were directed toward Mata, and therefore neither supports Mata's claim of duress. In the first instance, James Alexandre allegedly threatened to "shoot up" John Rios' house and family. [RT 1576] In the second, Mata complains that Keith LNU threatened there would be "three dead mother fuckers" unless the deal was quickly consummated. (Mata AOB at p. 35). In Mata's own trial testimony, however, he illustrated unequivocally that this was not an immediate threat of death or grave bodily harm to him by LNU:
 
 
 111
 By Mata: ... And he (Keith) was just like ranting and raving like fuck, fuck, fuck you, me and Ernesto are going to be three dead mother fuckers if we don't get this thing done today.
 
 
 112
 Q: What was your understanding of what that communication was?
 
 
 113
 By Mata: I told him at that point--well, I understood that he was trying to include me at that point and I said Keith, I had nothing to do with this. I said, Keith, I just came here to show you where John lived and then he corrected himself and said, well, me and Ernesto are going to be two dead mother fuckers.
 
 
 114
 R.T. 1524, March 26, 1991. Neither of these "threats" to third persons are "direct and immediate threats of death or grave bodily injury" of the type required to satisfy the necessary showing on the first duress element.
 
 
 115
 In addition, the evidence did not demonstrate that Mata lacked a reasonable opportunity to escape. Indeed, it showed he had ample opportunity to withdraw from the scheme and notify the authorities.
 
 
 116
 Mata did not make out a prima facie duress defense. In the face of this failure, the evidence was more than sufficient to support a rational trier of fact in finding that Mata acted voluntarily, and is therefore guilty beyond a reasonable doubt.
 
 
 117
 Neither do we find the evidence in this case insufficient to support Martinez' conviction. Once the government has proved the existence of a narcotics conspiracy, evidence of only a slight connection, established beyond a reasonable doubt, will be sufficient to support a conviction for knowing participation in the scheme. United States v. Cuevas, 847 F.2d 1417, 1422-23 (9th Cir.1988), cert. denied, 489 U.S. 1012 (1989). Viewed in the light most favorable to the government, the evidence in this case is sufficient to establish Martinez' connection to the conspiracy, and that he possessed the cocaine with the intent to distribute it.
 
 M.
 
 118
 Martinez assigns as error the district court's decision permitting Tony Yllan to make an in-court voice identification of Martinez from a surveillance tape played in court. The tape itself was already properly in evidence. We review for abuse of discretion. United States v. Gregory, 891 F.2d 732, 734 (9th Cir.1989).
 
 
 119
 An identification of voice, either firsthand or from a recording, may be authenticated "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed.R.Evid. 901(b)(5). "Lay opinion on this issue is permissible so long as the witness testifying has the requisite familiarity with the speaker." United States v. Thomas, 586 F.2d 123, 133 (9th Cir.1978).
 
 
 120
 Martinez complains that Yllan was not a party to the conversation played in court, that Martinez was not identified by name in the conversation, and that the evidence was "highly prejudicial." None of these objections, however, foreclose the admissibility of Yllan's identification. There is no requirement that the identifier have participated in the conversation at issue, nor must the speakers be otherwise identified in the passage. Finally, the identification process in this case cannot be characterized as so suggestive "that the mental image derived from the identification procedure supplant[ed] that derived from the witness's own experience." United States v. Basey, 613 F.2d 198, 202 (9th Cir.1979), cert. denied, 446 U.S. 919 (1980), quoting United States v. Kim, 577 F.2d 473, 483 (9th Cir.1978). Here, Yllan had sufficient contacts upon which to base his identification of Martinez' voice. The district court did not abuse its discretion in permitting the in-court identification.
 
 N.
 
 121
 Appellants contend they are entitled to a reversal as a result of unindicted co-conspirator Tony Yllan's statement transcript being passed out to the jury. The transcript was distributed by counsel for Mata before its admission was moved. The statement implicated all defendants, however, and the court ruled that only a redacted version of the tape of the statement could be played before the jury. The transcripts were collected from the jury, but at least one juror apparently read the transcript before they were collected. The court did issue cautionary instructions.
 
 
 122
 Generally, a codefendant's post-arrest statement may not be admitted to incriminate another codefendant. Bruton v. United States, 391 U.S. 123 (1968). We review allegations of Bruton errors de novo. United States v. Reyes-Alvarado, 963 F.2d 1184, 1187 (9th Cir.), cert. denied, 113 S.Ct. 258 (1992). We find that Bruton is not implicated here, and that the cautionary instructions were sufficient to cure any error in the dissemination of the transcripts.
 
 
 123
 The Supreme Court in Bruton held that the Sixth Amendment's confrontation clause is offended irreparably by the admission of a codefendant's confession implicating the complaining defendant. 391 U.S. at 136-37. Central to that ruling was the impermissible risk that the jury might ascribe great weight to the inherently suspect testimony of one "who stands accused side-by-side with the defendant," Id. at 136,[12] while at the same time denying the defendant the opportunity to confront his codefendant in open court on the incriminating statement. No such risk was present here. Yllan was one of the government informants. He actually testified and succumbed to vigorous cross-examination by the defense. We decline to find a confrontation clause violation under these circumstances.
 
 O.
 
 124
 Appellant Mata complains pro se that the district court erred in refusing to admit evidence of government informant James Alexandre's prior arrest for threatening conduct with a firearm. Mata contends proof of this prior incident, wherein Alexandre allegedly threatened his (Alexandre's) girlfriend, should have been admitted in support of Mata's duress defense, and to impeach Alexandre's testimony that he "never threatened anybody." We find no error.
 
 
 125
 Under Fed.R.Evid. 608(b), specific instances of conduct of a witness may not be proved by extrinsic evidence. They may be inquired into on cross-examination of the witness, in the court's discretion, if probative of the witness's veracity. Here, the court properly ruled that extrinsic proof of prior threats made by Alexandre, unrelated to this investigation, would not be received. [RT 648-651] Mata does not point to any instance of the defense attempting to elicit testimony on this prior threat from Alexandre on his cross-examination, and has thereby failed to demonstrate an abuse of discretion on the part of the court in foreclosing such inquiry.
 
 P.
 
 126
 Finally, appellants maintain that the cumulative effect of the alleged errors denied them a fair trial, and that reversal is therefore required. We disagree. Appellants have failed to demonstrate errors committed by the trial court that were of sufficient magnitude to affect the fundamental fairness of the proceeding. We decline to overturn defendants' validly entered convictions on this basis.
 
 III.
 
 127
 The judgment of the district court is affirmed.
 
 
 128
 AFFIRMED.
 
 
 
 *
 Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Each Appellant, with the exception of Rios, has incorporated the relevant arguments on appeal of his co-appellants. Fed.R.App.Proc. 28(i). Rios attempts to incorporate the arguments of his co-appellants for the first time in his reply brief. This is equivalent to raising those arguments for the first time in the reply brief. Rios has thereby waived those issues on appeal. United States v. Bentson, 947 F.2d 1353, 1356 (9th Cir.1991) cert. denied, 112 S.Ct. 2310 (1992)
 
 
 [2]
 It does not appear from the record that any appellant objected on this ground when the tapes were offered into evidence. We review, therefore, only for plain error. United States v. Hutson, 843 F.2d 1232, 1238 (9th Cir.1988)
 
 
 [3]
 During the government's presentation, the tapes were marked for identification and were played aloud before the jury in conjunction with the testimony of prosecution witnesses Tony Yllan and James Alexandre. The jury received transcripts to aid in their understanding of the tapes, but the transcripts themselves were not received into evidence. [RT 3/26/91, Document No. 227 at p. 1516]
 
 
 [4]
 The government objected to revelation of Liliana's identity because she was participating in an undercover capacity in another investigation. [RT 1/24/91 at p. 470]
 
 
 [5]
 The one event to which LNU was the only percipient witness (other than an Appellant) cannot be described as "critical". LNU transported Mata to the Reid-Hillview airport and dropped him off, at which time he was arrested. Any interaction which took place on that trip could not have supported any defense by Mata. The criminal enterprise was by that time over. The delivery had been made, and the other Appellants had already been arrested
 
 
 [6]
 The government did not rely at all on Liliana's testimony. Furthermore, the only event to which she was "percipient" was recounted at trial by government witnesses Alexandre and Yllan, and by defendant Mata. Her testimony could only have been cumulative
 
 
 [7]
 Perez did not testify at trial and was not prosecuted in conjunction with appellants
 
 
 [8]
 Yllan testified not for the defense, but for the prosecution. Nevertheless, when applying the Lord test outside of the arena of wrongful denial of immunity, we discern no reason to limit the inquiry to defense witnesses. Improper influencing of prosecution witnesses is no less harmful to defendants
 
 
 [9]
 The court apparently only reviewed the transcript of one of the tapes before the May 8, 1991 hearing. Upon being informed on that date that there was a second tape (which closely paralleled the first), the court stated that it would review the second tape after the hearing [RT 5/8/91, Document No. 215, at pp. 17-21]
 
 
 [10]
 Although Mr. Ellison represented to the court that Yllan was willing to submit to a polygraph, Yllan apparently invoked his Fifth Amendment rights upon advice of his own counsel and refused
 
 
 [11]
 See United States v. Echeverry, 698 F.2d 375, 377 (9th Cir.), modified, 719 F.2d 974 (9th Cir.1983)
 
 
 [12]
 Because we find no violation of the confrontation clause, we need not decide whether Bruton extends to statements made by undercover government informants