**UNITED STATES of America, Plaintiff/Appellee,**

v.

**Solomon Bitton SIMTOB, Defendant/Appellant.**

No. 86–3188.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 1987.

Decided April 26, 1990.

Eugene G. Iredale, San Diego, Cal., for defendant/appellant.

Byron H. Dunbar, U.S. Atty., Carl E. Rostad, Asst. U.S. Atty., Great Falls, Mont., for plaintiff/appellee.

Before SCHROEDER *, POOLE and CANBY, Circuit Judges.

POOLE, Circuit Judge:

Appellant Solomon Simtob appeals his conviction on one count of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). Simtob's defense at trial was entrapment.

* The Honorable Mary M. Schroeder, United States Circuit Judge, was drawn to replace the Honorable Raul A. Ramirez, United States District Judge for the Eastern District of California, who retired from the bench.

He contends on appeal that the failure of the district judge, after the close of evidence, to admit into evidence a tape recording which allegedly established perjury by the government's main witness on the issue of predisposition violated Simtob's sixth amendment rights to confrontation and compulsory process. He also challenges the trial court's admission of twelve- and thirteen-year old convictions on similar charges of drug distribution which the prosecutor argued were probative of predisposition, and contends that certain prosecutorial misconduct during examination of witnesses denied him a fair trial. We reverse the conviction.

## FACTS AND PROCEEDINGS

After his arrest for possession of cocaine and marijuana in March 1985, a drug dealer, Mick Benson, began to work for the Drug Enforcement Administration (DEA) as an informant in the area of Shelby, Montana. Because Benson had no personal relationship with defendant-appellant Solomon Simtob, he asked a mutual friend, Larry Francum, to inquire of Simtob whether he would sell Benson an ounce of cocaine. At a mid-May meeting with Benson surreptitiously recorded by the DEA, Simtob refused to "have anything to do with coke." Two weeks later, however, on May 31, Simtob spoke again with Benson, and, on June 3, provided the informant with one ounce of cocaine for $2,200.

At another meeting on June 12, also monitored, Benson asked Simtob whether he could obtain a pound of cocaine. Simtob told him that he wanted to quit, and urged Benson to get out of the business of dealing drugs. Nevertheless, at a June 17 meeting, Benson arranged with Simtob a buy of another ounce of cocaine for $2,300, which transaction took place on the 25th of June.

In February 1986, a two-count indictment was filed in the District of Montana, charging Simtob with two counts of cocaine distribution in violation of 21 U.S.C. § 841(a)(1). After an evidentiary hearing, the district court denied Simtob's pre-trial motion to dismiss the indictment because of "outrageous governmental misconduct," and the case was tried before a jury on July 15–18, 1986.

It is not disputed that Simtob distributed cocaine to a government informant, as charged in the indictment; Simtob's defense at trial was entrapment. The trial judge found sufficient evidence of inducement to warrant an instruction on entrapment, and correctly instructed the jury that, the defense having been raised, it was the government's burden to prove either 1) that the defendant was not induced or persuaded to commit the crimes charged or 2) that the defendant was predisposed to commit the crimes charged before the government's attempts to persuade him to do so.

The first count of the indictment was dismissed as a result of jury deadlock; Simtob was convicted on count II and sentenced to ten years in the custody of the Attorney General, pursuant to 18 U.S.C. § 4205(b)(2), and to a special probation term of six years. Simtob now challenges his conviction on the basis of various assignments of error at trial, the circumstances of which are discussed separately below.

## DISCUSSION

I. *Exclusion of a Tape Recorded Telephone Conversation.*

By way of proving inducement, Simtob presented evidence at trial that he had in fact refused both Benson and Francum on numerous occasions, that Benson had induced him to procure the drug through repeated entreaties and by providing Simtob, who had overcome a cocaine addiction in the past, with a quantity of cocaine for Simtob's personal use, and by exploiting Simtob's difficult financial situation. In rebuttal, the government called Greg Nesbo to testify as to Simtob's predisposition. Nesbo, who had previously pleaded guilty to a drug offense and who testified pursuant to his plea agreement with the United States, stated on direct examination that Simtob had supplied him with cocaine for almost three years, that he had purchased cocaine from Simtob approximately twenty

times over that period, and that, on at least one occasion, he had purchased the drug from Simtob in the basement of Simtob's home, at which time he had seen a safe filled with packages of white powder.

On cross-examination, Nesbo admitted that he had been approached by Benson before he was due to testify, and that Benson had spoken with him about his forthcoming testimony. Although apparently acting on his own and not at the request of the government, Benson had indicated to Nesbo that if he in any way deviated from "earlier statements" to the government, DEA agent Mountsier, in charge of the investigation of Simtob, would be able to increase Nesbo's sentence, would in fact do so, and that "it[ ] [had] already been worked out." Defense counsel was also able to elicit that Nesbo, who weighed over 500 pounds and was serving his sentence out of prison as a part of his plea bargain, had an extreme fear of incarceration because he would be unable to receive necessary medical attention in prison.

Nesbo's was the final testimony at trial. He was the government's primary witness on the issue of predisposition, and his credibility was very much at issue.

The night following Nesbo's testimony and before the final arguments to the jury, Simtob telephoned Nesbo, and, when the latter returned his call, tape recorded the conversation.[1]

Made aware of this conversation, counsel for appellant listened to the tape the following day and that morning described its contents to the court *in camera*. Counsel's offer of proof suggested that the tape contained evidence of perjury by Nesbo, or at least of inconsistency bearing directly on Nesbo's credibility; he requested permission either to play the tape to the jury or to recall Simtob so that he could testify as to the content of his conversation with Nesbo. Counsel also suggested recalling Nesbo to

1. The relevant portion of the taped conversation is set forth below.

Nesbo: I said the things that I said today because I had to. If I hadn't said those things, I was going to get thrown in jail for a long time, and I couldn't have that. Okay? ...

Simtob: Remember you said about, you know, the thing, you know—what made you say that, that going down stairs, though? I mean, did you even go down stairs in my house?

Nesbo: I don't know if it was your house or Steiner's house.

Simtob: Well, do you—I mean do you have no idea?

Nesbo: No. That was really too long ago and my memory fails me but please— ...

Nesbo: Try and understand. If I hadn't said the things I did today, I would be thrown away in jail and I—I couldn't have that ...

Simtob: Okay, I know, I know, I know, Greg. But I mean, you don't—you don't—do you remember, I mean, ever coming down in the basement, you know?

Nesbo: Well, I don't—I don't even know what I remember.

Simtob: I mean did you—I mean did you used to go downstairs before: could you be—

Nesbo: Years ago, years ago.

Simtob: Okay, Well how many years?

Nesbo: Oh, many years.

Simtob: Well, when was the last time? Can you remember when the last time was?

Nesbo: What was that?

Simtob: When was the last time you went downstairs?

Nesbo: It was so long ago I can't remember.

Simtob: Come on Greg, please. I mean I got to know. I mean I want to know because—I mean, geez. I mean—

Nesbo: It was two or three years, at least.

Simtob: Two or three years? was it—could it have been—I mean what was it, two or three?

Nesbo: Two, two and a half, three. I don't remember.

Simtob: You don't remember. Well, you know, I've only lived there for two years and two months.

Nesbo: It could have been two years and two months. I could have been—my memory fails me. It could have been three years; it could have been three and a half. I don't know. My memory doesn't serve me too well.

Simtob: Well, okay, yeah, alright. But Greg, I mean, was I there?

Nesbo: I'm so confused I can't even say for sure.

Simtob: Yes, but why did you say it on the—I mean why did you say it up there, you know? Here I am just hurting, just wondering why you know.

Nesbo: All I can say is I had to say the things I said today or I would have been thrown in jail....

Simtob: ... Well, why did you say—why did you say I sold cocaine to you?

Nesbo: If I hadn't said the things I said today, I'd be in jail. Try and understand that.

further cross examine him by confronting him with the tape.

The court denied appellant's motion. Apparently because he decided the tape would be cumulative of the previous day's cross-examination,[2] the court declined either to listen to the tape in camera, or to have a transcript made until after the argument was over.[3]

Simtob contends that the tape was "new evidence" containing "admissions of perjury on the part of the chief and only rebuttal witness and the major witness on the issue of predisposition," and that in denying him the opportunity either to present the evidence or confront and cross-examine the witness further, the court violated Simtob's sixth amendment rights to compulsory process and confrontation.

The government contends that defendant's counsel had ample opportunity to cross-examine Nesbo, to test the witness's credibility, and to challenge extensively Nesbo's motives for his testimony. The government also suggests that reception of the evidence so late in the trial would have imbued it with distorted importance, and that, because the court was not prepared to allow further surrebuttal by the United States, admission of the tape without an adequate opportunity to rebut the evidence would have unfairly prejudiced the government's case.

Federal Rule of Evidence 611 provides that:

> The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time....

■ We review the trial court's decision whether to reopen a case for abuse of discretion. *United States v. McQuisten,*

795 F.2d 858 (9th Cir.1986). *United States v. Dupuy,* 760 F.2d 1492 (9th Cir.1985). To the extent that the court's ruling constituted a limitation on cross-examination, it too is reviewed for abuse of discretion. *United States v. Benny,* 786 F.2d 1410, 1419 (9th Cir.) *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). Our inquiry on an appeal asserting abuse of discretion in such matters is whether the court's decision was rendered on a consideration of relevant factors, and whether a clear error of judgment has been made. *See United States v. Campbell,* 774 F.2d 354, 356 (9th Cir.1985).

■ When the tape was originally discussed at Simtob's motion to reopen the evidence before argument, the trial court was informed of its content but did not review it. Indeed, the trial court apparently *never* reviewed the tape, even in response to Simtob's post-trial motions for mistrial. Under the circumstances of this case, where the tape was represented as containing information important to the ascertainment of the truth, the trial court clearly erred in failing at least to make some personal review of its content *in camera.* The trial judge, in effect, declined to exercise his discretion at all; his determination of the tape's cumulative nature or, alternatively, of its value to the defense, was therefore made without a proper "consideration of relevant factors," and constituted an abuse of discretion.

■ Further, we cannot adjudge the error to be harmless. Our review of the tape convinces us that it contained information bearing sufficiently on the credibility of the prime prosecution witness that it might well have affected the outcome of the case. While we recognize the limitations of the tape that arise from the manner of its creation, we conclude that the defendant was entitled to cross-examine and to at-

---

**2.** The court's only ruling on the matter was during its discussion with defense counsel after his offer of proof, in which the court stated, "T[t]his could go on and on and on. I don't think that proves a * * * lot of anything, especially after the trial is over. I just think there's got to be an end to this."

**3.** The court did allow counsel to recall Simtob for the limited purpose of testifying as to the width and condition of his basement stairs, apparently in an effort to establish the unlikelihood that a man of Nesbo's stature could negotiate them.

tempt to impeach Nesbro with its contents. The statements in the tape went beyond anything already in evidence, and were therefore not merely cumulative.

## II. *Prosecutorial "Vouching."*

As mentioned above, on cross-examination of Nesbo, defense counsel was able to elicit testimony to the effect that Nesbo may have been testifying as he did in part as a result of Benson's discussion with him, and of his fear of prison. On redirect examination of Nesbo, the following colloquy took place in open court and in the presence of the jury:

Mr. Rostad (for the prosecution): Based on Mr. Nesbo's answers on the cross-examination and the specter that possibly he's testifying as he is merely out of threats, I would offer at this time also to immunize Mr. Nesbo for any possible false statement to federal officers, and I would ask the court to explain to Mr. Nesbo what the effect of that is.

Mr. Iredale (for defendant): I object at this time. It's improper, it's not appropriate.

The Court: Yes, I agree.

Mr. Rostad: Your Honor, I only want Mr. Nesbo to tell the truth.

Mr. Iredale: And I move to strike it out your Honor.

The Court: The jury will disregard.

On further cross examination of Nesbo, counsel for defendant again attempted to establish the depth of the witness's fear of prison. The trial judge explained to Nesbo and the jury that the court alone, and not the government or the DEA, was responsible for any sentence modification, however. Then the following discussion took place, again before the jury:

Mr. Rostad: Mr. Nesbo, do you have anything you'd like to say to the jury that's different than your direct testimony at all? Just the truth, nothing but the truth, so that we can find out what really is going on here just today, right now, telling them exactly what you know about Solomon Simtob, and if you told any prior falsehoods or

something, just abandon those. Just tell us if there's anything different that this jury should know.

Mr. Nesbo: I guess I would say that I have been as truthful as I can be today. I get the feeling you think I may be telling a falsehood.

Mr. Rostad: No, Mr. Nesbo, I'm wanting to be sure.

Mr. Iredale: I object to counsel's argument or statements.

The Court: I will tell the witness, are you telling this jury that you told them the truth here today?

Mr. Nesbo: Yes.

Appellant asserts that the prosecutor's offer in the jury's presence to immunize the witness against previous false statements, followed, as it was, by repeated exhortations to the witness to tell the truth, was closely akin to vouching for Nesbo's credibility and injected improper argument to the jury which denied Simtob a fair trial. We agree.

■ The government may not vouch for the credibility of its witnesses, either by putting its own prestige behind the witness, or by indicating that extrinsic information not presented in court supports the witness' testimony, *United States v. Roberts*, 618 F.2d 530, (9th Cir.1980), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981) nor may the prosecutor imply that the Government has taken steps to assure the veracity of its witnesses. *Id.;* *see also United States v. Brown*, 720 F.2d 1059, 1073 (9th Cir.1983).

■ Here the prosecutor's discussion of Nesbo's remarks in relation to earlier statements which were not before the jury (and of which the jury could assume only the government was aware) could have implied that the government had certain knowledge whether Nesbo was in fact telling the truth. Further, by offering to immunize Nesbo in open court, the government not only conveyed to the jury its strong belief that Nesbo was telling the truth, but also told them that it was willing to risk all the forensic advantages of its case in order to permit this witness to speak without re-

straint or fear. The court in *United States v. Roberts*, remarking on the possible unfair consequences of admitting as evidence a plea agreement which contained a promise of truthfulness, stated:

> The witness, who would otherwise seem untrustworthy, may appear to have been compelled by the prosecutor's threats and promises to come forward and be truthful. The suggestion is that the prosecutor is forcing the truth from his witness and the unspoken message is that the prosecutor knows what the truth is and is assuring its revelation.

618 F.2d at 536. This eleventh-hour offer of immunity was laden with this same potential for prejudice. The prosecution may not, as happened here, portray itself as a guarantor of truthfulness. *Roberts*, 618 F.2d at 537.

■ When prosecutorial conduct is called in question, the issue is whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) cited in *U.S. v. McKoy*, 771 F.2d 1207, 1212 (9th Cir.1985). Prompt and effective action by the trial court may neutralize the damage by admonition to counsel or by appropriate curative instructions to the jury, *See, e.g. United States v. Mikka*, 586 F.2d 152, 156 (9th Cir.1978) *cert. denied*, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979), but prosecutorial misconduct invites reversal if it appears more probable than not that the alleged misconduct affected the jury's verdict. *United States v. Flake*, 746 F.2d 535 (9th Cir.1984) *cert. denied* 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985). We look to see whether the court's remarks were sufficient to undo the harm of the prosecutor's remarks.

■ The trial judge did address the crisis. He agreed with the defense counsel that the remarks were "inappropriate", and said, "the jury will disregard." In its subsequent instructions to the jury, the court included a general advice that "[t]he prosecutor cannot vouch for the truthfulness of a witness. That determination is to be made by you alone." Given the thrust of the government's remarks, however, it is very doubtful that the generalized observations of the court really conveyed a sufficient sense of judicial disapproval of both content and circumstance needed to dispell the harm in the core of the prosecutor's statements. The experienced trial judge in this case had at hand a variety of means for treating the problem, which we do not presume to detail; we are compelled to conclude that the harm in this instance was simply not cured.

We hardly need to note that only the prosecutor, not the court nor other counsel, has the power to offer immunity to a witness. This authority is thus already a powerful coercive weapon in the government's arsenal. Certainly this particular offer of immunity, coming as it did in full hearing of the jury as the rhetorical climax of a heated direct examination, projected extraordinary dramatic and inferential power.

We note also that this was a close case for the prosecution—the jury could not agree on one of the two charges—*compare United States v. Giese*, 597 F.2d 1170, 1200 (9th Cir.) *cert. denied* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (overwhelming evidence of guilt), and the outcome depended greatly upon Nesbo's credibility as the government's chief witness on the issue of predisposition. To the extent that the injections by the prosecutor added weight to the sensitive balance of Nesbo's credibility at all, it could well have had critical influence.[4] Considered in the context of the entire trial then, and combined with the trial court's ruling as to the proffered tape, which also bore on Nesbo's credibility, we cannot say that the prosecutorial impropriety did not adversely affect the jury's ability to judge the evidence fairly.

---

**4.** It is of significance that the count on which the jury could not agree involved substantially identical conduct.

III. *Admission of "Stale" Drug Convictions.*

Simtob further claims error by the district court in allowing the government to impeach him with a 1974 conviction involving a distribution of an ounce of marijuana, and to inquire into the facts of a 1973 conviction for distribution of a small quantity of LSD.[5] He contends this evidence was irrelevant and that prejudice outweighed the probative value of either conviction.

### A. Relevance

Federal Rule of Evidence 609(a) allows impeachment of a witness by evidence of prior convictions if the crime was punishable by imprisonment for over a year, provided the court determines that the probative value of admitting the evidence outweighs its prejudicial effect. Fed.R.Evid. 609; *United States v. Dixon*, 547 F.2d 1079, 1082–83 (9th Cir.1976). Because Simtob was released from prison in 1978, within 8 years of his trial, his 1974 conviction *must be* admitted as one less than ten years old, as calculated under Fed.R.Evid. 609(b), subject to the trial court's determination of the probative/prejudicial balance. *Dixon*, 547 F.2d at 1083.

Both convictions were clearly offered to prove predisposition; the government argued:

> Maybe Mr. Simtob paid for his mistakes and was really trying to go straight. That's for you to decide, but in deciding that you have to remember that he's testified that he sold LSD in 1973, was dealing in marijuana in 1974 and spent four years in prison. I suggest to you, ladies and gentlemen, the evidence shows that Mr. Simtob is merely a leopard that never changed its spots. He has also been a drug dealer. He was a drug dealer in '73, '74.

■ Under Federal Rule of Evidence 404(b), evidence of other crimes is admissible to prove intent—or, where entrapment is in issue, "predisposition"—if 1) the prior act is similar and close enough in time to be relevant, 2) the evidence is clear and convincing, and 3) the probative value of the evidence outweighs any potential prejudice. *United States v. Lopez–Martinez*, 725 F.2d 471, 477 (9th Cir.) *cert. denied* 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984). Where entrapment is in issue, "similarity" of prior drug offenses exists if the earlier conviction tends to prove that defendant was engaged in illegal operations in some way similar to those charged in the indictment, even if the drugs involved may be different. *Lopez–Martinez*, 725 F.2d at 477 ("The fact that the first [conviction] involved marihuana while the second involved heroin does not bar admission, when both arrests were for possession with intent to distribute.... [citation omitted]"); *United States v. Segovia*, 576 F.2d 251, 252 (9th Cir.1978); *Cf. United States v. Bramble*, 641 F.2d 681 (9th Cir.1981) (court found reversible error in the admission of a prior conviction for marijuana possession in a prosecution for distribution and possession with intent to distribute cocaine). Because both of Simtob's prior convictions were for distribution, albeit of different drugs, both were relevant to the issue of predisposition.

### B. Prejudicial/Probative Balance

Federal Rule of Evidence 609 requires the trial court to determine before admitting such a conviction for impeachment that it is more probative than prejudicial. And Fed.R.Evid. 403 states that *all* relevant evidence—including, of course, evidence admitted under Rule 404—may be excluded if the trial court finds it to be more prejudicial than probative.

Simtob argues that even if relevant, the prior convictions should not have been admitted under these rules. Because the conduct underlying them was so old, and because they were used to prove intent, Simtob contends that the convictions were more prejudicial than probative. We review the trial court's determination of admissibility for abuse of discretion. *Lopez–Martinez*, 725 F.2d at 477.

---

5. The trial court's denial of appellant's motion *in limine* to exclude the convictions resulted in their being admitted by Simtob himself on direct examination.

Where predisposition is directly in issue, courts should be extremely cautious about admitting old convictions because their prejudicial impact may frequently outweigh their probative value. For example, appellant relies upon the Supreme Court's decision in *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), in which the court held, in language peculiarly apropos of our case, that

> [A] nine year old sales conviction and a five year old possession conviction are insufficient to prove petitioner had a readiness to sell narcotics at the time [the informant] approached him, particularly when we must assume from the record that he was trying to overcome a narcotics habit at the time.

356 U.S. at 375–76, 78 S.Ct. at 822–23.

In *United States v. Tom*, 640 F.2d 1037 (9th Cir.1981), we considered the propriety of admitting evidence of a five-year old conviction in an entrapment case. The trial court ruled that the prior conviction was too old to be probative on the question of predisposition, but strongly bore on the issue of the defendant's credibility as a witness. While we noted the inherent prejudice in the admission of such conviction, we found no fault with the trial court's exercise of its discretion in balancing the probative and prejudicial value of the conviction:

> [t]he testimony was, as the trial judge recognized, highly prejudicial. This is especially true given defendant's reliance on the defense of entrapment. He needed to show doubt as to whether he was predisposed to drug dealing. The jury may well have improperly inferred predisposition from the past conviction [footnote omitted]. The trial court went through the Rule 403 balancing analysis and decided that the impeaching testimony was too pertinent to credibility to be excluded [footnote omitted]. *This balancing ... is committed to the trial court* [citation omitted] (emphasis supplied).

640 F.2d at 1039–40.

It is not clear that any abuse of discretion has been shown in our case in the light of *Tom*. Predisposition was a major, if not central issue in the case and the convictions were old, but there was *some* probative value in their presentation. We do not have a situation in which the jury has improperly inferred predisposition based upon convictions which were not at all probative, and it seems clear that the trial judge considered both the age and "remoteness," [6] of the convictions in response to counsel's suppression motion. The question is close, but we are inclined under these circumstances to defer to the trial judge's consideration and conclusion that the evidence was admissible.

## IV. Other Error.

We touch now briefly on defendant's other contentions of error.

### A. Possible Jencks Act Violation

Appellant argues that the district court erred in failing to order a new trial, or alternatively, to strike Benson's testimony, because Benson had destroyed some rough notes he had made during his investigation of Simtob, arguably in violation of the Jencks Act, 18 U.S.C. § 3500 (the Act). It is the responsibility of the district court to determine whether such notes constitute "statements" within the meaning of the Act, *United States v. Johnson*, 521 F.2d 1318, 1320 (9th Cir.1975), and, if so, to determine whether and what sanctions might be appropriate. *United States v. Parker*, 549 F.2d 1217, 1224 (9th Cir.) *cert. denied*, 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). We therefore review a trial court's ruling on Jencks Act issues for an abuse of discretion. *United States v. Polizzi*, 801 F.2d 1543, 1552 (9th Cir.1986).

The evidence was conflicting on whether Benson's notes could be con-

---

6. We may infer as much from the fact that Simtob's 1969 conviction for possession of marijuana was found by the trial judge to be inadmissible 1) because it was a juvenile conviction and therefore expunged, 2) because it was for possession rather than sale, and 3) because it was too remote.

sidered "statements" for purposes of the Act. Counsel for Simtob elicited on cross-examination that the notes were written by Benson himself contemporaneously with events described, and contained at least one reference to Simtob. They therefore related, in small part, to the subject matter of direct examination, and arguably were statements under the Act. *See Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *Polizzi,* 801 F.2d at 1552 (9th Cir.1986). Other testimony indicates, however, that Benson's notes were merely bits and pieces of information which he collected and reduced to writing to refresh his recollection during discussions with DEA agent Mountsier concerned various suspects, not merely involving Simtob. A government agent's rough notes will not be Jencks Act statements when they "are not complete, are truncated in nature, or have become an unsiftable mix of witness testimony, investigator's selections, interpretations, and interpolations," *United States v. Griffin,* 659 F.2d, 932, 937 (9th Cir.1981) *cert. denied,* 456 U.S. 949, 102 S.Ct. 2019, 72 L.Ed.2d 473 (1982), *quoting United States v. Spencer,* 618 F.2d 605, 606 (9th Cir.1980).

██ But even if the notes do amount to statements which would have been producible under the Jencks Act, the trial court correctly considered both the possibility of government culpability as well as the degree of injury to the defendant. *United States v. Finnegan,* 568 F.2d 637, 642 (9th Cir.1977); *see also United States v. Miller,* 771 F.2d 1219, 1233 (9th Cir.1985) (harmless error doctrine applies to Jencks Act decisions). Appellant concedes that the record indicates that the case agent did not *direct* the destruction of the notes, and that they were destroyed by Benson—apparently concerned about maintaining his cover and personal safety—without any impropriety on the part of the government.

Under these circumstances, even though the trial judge did not clearly rule that the notes constituted "statements" under the Act, we find no abuse of discretion in its refusal to strike Benson's testimony or order a new trial as a result of their destruction.

### B. Alleged Due Process Violation

██ Simtob also argues, as he did before the trial court, that the government's conduct in its investigation was so outrageous as to violate his due process rights, warranting dismissal of the indictment against him. We review such contentions *de novo. United States v. Smith,* 802 F.2d 1119, 1124 (9th Cir.1986). In evaluating such a charge, we look only to the government's conduct, without regard to the defendant's criminal predisposition. *Id.* at 1125, *citing United States v. Bogart,* 783 F.2d 1428 (9th Cir.1986) *reh'g granted,* 790 F.2d 802 (9th Cir.1986).

██ Law enforcement conduct becomes constitutionally unacceptably under the Due Process Clause only when it "shocks the conscience" of the court. *Bogart,* 783 F.2d at 1438. Appellant cites as examples of the government's allegedly outrageous conduct 1) Benson's use of Simtob's friend as an intermediary, 2) Benson's exploitation of Simtob's sympathy in convincing him that he, Benson, desperately needed the money from resale of the cocaine, 3) Benson's "tampering" with witness Nesbo by cautioning him against changes in his testimony, and 4) Benson's alleged "destruction of evidence" (referring to Benson's notes), which "interfered with the validity and sanctity of the judicial process."

While the acts of Benson were sometimes reprehensible, we conclude that they do not rise to a level that denied Simtob due process. Benson did not create the crime, or otherwise act in so central a fashion as to fall within the narrow doctrine of outrageous government conduct. *See United States v. So,* 755 F.2d 1350, 1353 (9th Cir.1985). Benson's use of Simtob's friend and his appeals to sympathy do not shock the conscience if we assume, as the jury found, that they did not entrap Simtob into committing a crime he was not already disposed to commit. Benson appears to have destroyed the notes in order to maintain his cover, rather than to deprive Sim-

tob of a fair trial. Benson's approach to witness Nesbo on the eve of trial is far more troubling. It was not done at the instance of the prosecution, however, and we have little doubt that if the case is retried, adequate precautions will be taken to minimize the effect of the past and to prevent its recurrence.

## CONCLUSION

For the reasons discussed above, the conviction is REVERSED.