**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles J. SANCHEZ, Jr.,
Defendant–Appellant.**

No. 97–30002.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 1, 1999.

Decided June 1, 1999.

Wendy Holton, Helena, Montana, for the defendant-appellant.

C. Ed Laws, Assistant United States Attorney, Billings, Montana, for the plaintiff-appellee.

Before: ALARCON, RYMER and KLEINFELD, Circuit Judges.

ALARCON, Circuit Judge:

Charles Jesse Sanchez ("Sanchez") appeals from the judgment entered following his conviction by a jury of the crime of assisting federal offenders to avoid apprehension. He seeks reversal claiming that the prosecutor's misconduct materially affected the jury's verdict resulting in a miscarriage of justice. We agree and vacate the judgment of conviction and remand for a new trial.

## I

## PERTINENT FACTS

Steve Denton and Dana Jo Thompson failed to appear for sentencing on February 3, 1995, for the crime of attempting to manufacture methamphetamine. On that date, they began an odyssey to escape sentencing and punishment for their crimes that took them to hotels and motels and various communities in several states. After their arrest, each of them entered into a plea agreement that required them to testify against those persons who allegedly aided them in their flight to escape apprehension.

A grand jury indicted Sanchez, Ray Ampher Farmer, John Austin Thompson, and David Charles Spencer on January 18, 1996 for assisting Denton and Dana Jo Thompson to prevent their apprehension and punishment. John Austin Thompson entered a plea of guilty on July 3, 1996, on condition that he testify as a government witness. He was promised a reduction in his sentence from five years to one year if he cooperated in the prosecution of Sanchez and Farmer. David Charles Spencer entered a plea of guilty on August 26, 1996. Ray Ampher Farmer went to trial with Sanchez and was also convicted.[1]

Denton was the key witness for the prosecution. He testified as follows: He met Sanchez in 1991. Thereafter, he supplied Sanchez with methamphetamine approximately every two weeks. In December of 1994, Denton and Dana Jo Thompson, his common-law wife, decided to flee to avoid sentencing for the crime of attempting to manufacture methamphetamine. They conducted a sale of their personal effects in late December or early January to finance their proposed flight to a foreign country. Sometime prior to the date set for sentencing, Denton told Sanchez he was "going to take off" because he did not want to go to prison or be separated from Dana Jo Thompson. He also asked Sanchez for his help in "getting some money together."

Prior to fleeing, Denton and Dana Jo Thompson stayed in Steve Braun's trailer. Sanchez came to Braun's trailer to purchase methamphetamine from Denton. On February 3, 1995, Denton and Dana Jo Thompson failed to appear for sentencing.

After Denton became a fugitive, he continued to supply Sanchez with methamphetamine. Denton relied primarily on the money he was paid by Sanchez for the drugs to subsidize his flight. Denton contacted Sanchez by telephone to inform him when Denton and Dana Jo Thompson moved to a different hotel or motel.

Farmer drove Denton to the Gran Tree Motel in Bozeman, Montana. Farmer paid for the room. Denton was registered under the name of Ray Farmer. Denton called Sanchez and Farmer from the Gran Tree Hotel to tell them he needed a car to move to another hotel.

On May 3, 1995, Denton and Dana Jo Thompson drove a Nissan truck to Farmer's house in Billings, Montana. They borrowed a car from Sanchez and drove it to Big Timber, Montana and registered in a motel. On May 4, 1995, Denton returned to Billings. He met Sanchez at Farmer's residence. Later on that day, Denton was a passenger in Sanchez's automobile, when

1. This court subsequently affirmed Farmer's conviction in an unpublished disposition.

*United States v. Farmer,* 141 F.3d 1180 (9th Cir.1998) (Table, text in 1998 WL 94152).

Sanchez received a ticket for speeding. Before the police officer approached Sanchez's vehicle, Sanchez asked Denton if he wanted Sanchez "to run." Denton told him: "No, we will take our chances." Denton gave the officer a fictitious name.

Denton asked Sanchez to drive him to Big Timber. Sanchez declined, stating that he was tired. Sanchez called John Thompson and asked him to meet them at a truck stop in Laurel, Montana. There, they were met by John Thompson, Dana Jo Thompson's brother. John Thompson drove Denton to Big Timber, Montana in Sanchez's automobile.

When John Thompson and Denton arrived in Big Timber, they saw the police at the hotel. Denton directed John Thompson to drive off. Denton escaped capture. Dana Jo Thompson and her brother were arrested. Denton had no further contact with Sanchez after that date.

Dana Jo Thompson, John Thompson, and Steve Braun were called by the prosecution to corroborate Denton's testimony. Each of these witnesses testified that he or she did not tell Sanchez that Denton intended to flee to escape punishment. They also testified that they could not recall hearing Denton or anyone else tell Sanchez that Denton and Dana Jo Thompson were fugitives.

Telephone records corroborated the fact that Denton and Sanchez exchanged telephone calls after February 3, 1995. None of these telephone calls was recorded. None of the hotel registration records introduced as exhibits by the Government was signed by Sanchez, or reflected that he had arranged for Denton's lodging. Records from car rental agencies were also introduced. None of them reflected that Sanchez rented a car for Denton or Dana Jo Thompson.

Dan Walters, a police officer for the City of Billings, testified that he gave Sanchez a traffic ticket for driving at a speed of 46 miles per hour in a 35 miles per hour zone on May 4, 1995. Sanchez gave his true name, address, and telephone number. The passenger turned his head away suspi-ciously. The passenger had no identification.

Deputy United States Marshal Mike Fielder testified that he questioned Sanchez in June 1995 about Denton. Sanchez stated he did not know Denton. Officer Fielder showed Sanchez a photograph of Denton. Sanchez responded that he did not recognize the person in the photograph. During cross-examination, Officer Fielder testified that he made no written report of the conversation.

In presenting his defense, Sanchez testified that Denton supplied him with methamphetamine for his personal use periodically until May 5, 1995. He visited Denton two or three times between February 1, 1995, and May 5, 1995 to purchase drugs and to obtain title to a truck that he had purchased from Denton. He also sought Denton's assistance in obtaining possession of personal property he had purchased from Denton in December of 1994.

During that period of time, Sanchez received telephone calls from Denton. The purpose of these calls was to inform Sanchez of the name and location of the motel or hotel where Denton was presently sojourning. Sanchez testified he did not rent any automobiles for Denton, nor did he reserve or pay for Denton's hotel or motel accommodations.

Sanchez testified that he received a traffic ticket on May 4, 1995. Earlier that day, he was at Farmer's residence when Denton appeared. Denton borrowed Sanchez's automobile to get drugs for Sanchez. When Denton returned, Sanchez agreed to drive him to a Kwik–Way store to pick up a chain saw Denton had purchased. En route, Sanchez received a traffic ticket for speeding. Sanchez testified that he did not ask Denton if they should flee from the police.

When the officer asked Denton for his name, Denton gave him a fictitious name. The officers told Sanchez and Denton they could not drive the car because neither one had a driver's license. Sanchez and Den-

ton walked across the street where Denton's friends were waiting. One of the friends drove the automobile to the County Market. There, Sanchez got into the car. Denton asked Sanchez to drive him to Big Timber. They drove to Farmer's house. Sanchez told his wife that Denton had given the police a fictitious name. She told Sanchez not to drive Denton to Big Timber.

Sanchez told Denton he would not drive him to Big Timber because he had used a false name. Sanchez asked Denton why the authorities were looking for him. Denton replied that it was probably because he had tested positive in a urinalysis test. Sanchez testified that Denton's response was significant because in December 1994 Denton had rented a room for Sanchez at the Fairfield Inn as partial payment for repairing Denton's truck. The room was registered in Denton's name. Sanchez heard a knock on the door, and a voice stated, "Room service." When Sanchez opened the door, United States Marshals asked for Denton. Sanchez told them that Denton was supposed to get some parts but did not return. They told Sanchez that Denton was wanted for a "dirty UA." The marshals did not inform Sanchez that Denton had fled from prosecution or punishment.

After Sanchez declined to drive Denton to Big Timber, Denton made a telephone call and then told Sanchez that John Thompson would meet them and drive Denton to Big Timber. Sanchez drove Denton to a truck stop in Laurel, Montana. There, John Thompson borrowed Sanchez's automobile. Sanchez drove Thompson's car to Farmer's residence.

Sanchez testified that he was never informed by Denton or anyone else that Denton had pleaded guilty to a drug charge and had not reported for sentencing. Sanchez was under the impression that Denton was on probation because probationers are required to submit to urinalysis tests. Sanchez was required to take such tests as a condition of his own proba-

tionary sentence for a state drug conviction.

Sanchez testified he did not drive Denton to Bozeman, Montana. He did not see Denton again from the date Sanchez received a ticket for speeding until after the date Denton was arrested. Sanchez saw Denton in jail where Sanchez was also being detained. At that time, Sanchez told Denton that he wanted the title to the pickup truck, and the furniture Sanchez had purchased.

Sanchez testified that he did not tell Officer Fielder in June 1995 that he did not know Denton. Instead, Sanchez testified that he told Officer Fielder that the pickup truck in his yard belonged to Denton. Sanchez also told Officer Fielder he did not know where Denton was.

## II

### PROSECUTORIAL MISCONDUCT

The conflicting testimony of Denton and Sanchez required the jury to determine which witness spoke the truth regarding whether Sanchez had been told by Denton that Denton and Dana Jo Thompson intended to flee to avoid punishment for their crimes. Persuading the jury that he was a credible witness, and that Denton and his accomplices should not be believed, because they expected leniency in exchange for their testimony, was critically important to the success of Sanchez's defense.

■ Sanchez contends that reversal is compelled in this matter because the prosecutor committed several acts of misconduct in his effort to destroy Sanchez's credibility with the jury. "Where defense counsel objects at trial to acts of alleged prosecutorial misconduct, we review for harmless error on defendant's appeal; absent such an objection, we review under the more deferential plain error standard." *United States v. Hinton*, 31 F.3d 817, 824 (9th Cir.1994). We address each of Sanchez's contentions under separate headings.

### A. *Forcing a defendant to call a prosecution witness a liar*

■ Officer Fielder testified, during the prosecution's case in chief, that Sanchez denied knowing Denton during an interview conducted on June 5, 1995. During his direct examination, Sanchez testified that he told Officer Fielder that he was repairing Denton's pickup truck. Sanchez further testified that he told Officer Fielder that he didn't know where Denton could be located. On cross-examination the prosecutor questioned Sanchez as follows:

Q. (By Mr. Laws:) You heard Deputy Marshal Fielder testify this morning?

A. Yes, I did.

Q. You were telling the ladies and gentlemen of the Jury that he lied to them?

A. Yes, I did.

Q. That is what you are saying, he lied this morning?

A. He seen the pickup in my yard and he goes, we know Steve [Denton]—he assumed I was hiding Steve [Denton] at the time.

■ Sanchez's trial counsel did not object to this line of questioning. Accordingly we must determine whether we can review the impact of the prosecutor's conduct on the fairness of the trial under the plain error standard of review. "To secure reversal under this standard, defendant must prove that: (1) there was 'error'; (2) the error was plain; and (3) the error affected 'substantial rights.'" *United States v. Turman,* 122 F.3d 1167, 1170 (9th Cir.1997) (citing *United States v. Olano,* 507 U.S. 725, 730–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

Before this court, Sanchez argues that it is error for a prosecutor to force a defendant to call a United States marshal a liar. Our court has not previously confronted this issue directly. Other courts have concluded, however, that this is improper cross-examination. We agree.

In *United States v. Richter,* 826 F.2d 206 (2d Cir.1987), the prosecutor forced the defendant to testify that an FBI agent was either mistaken or lying. *Id.* at 208. The Second Circuit held that the prosecutor was guilty of misconduct. In explaining its holding, the court stated:

> Pointing to the discrepancies between Lazzara's testimony concerning Richter's [FBI Special Agent] statements to him and Richter's testimony on the stand, the prosecutor asked Richter in a series of questions to testify that Lazzara was either mistaken or lying. This was improper cross-examination. Determinations of credibility are for the jury, *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967 (1944), not for witnesses, *Greenberg v. United States,* 280 F.2d 472, 475 (1st Cir.1960). Prosecutorial cross-examination which compels a defendant to state that law enforcement officers lied in their testimony is improper. *See People v. Montgomery,* 103 A.D.2d 622, 481 N.Y.S.2d 532 (1984) (per curiam); *People v. Davis,* 112 A.D.2d 722, 724, 492 N.Y.S.2d 212 (1985) (mem.).

*Id.*

Similarly, in *United States v. Sullivan,* 85 F.3d 743 (1st Cir.1996), the prosecutor asked the defendant a series of questions regarding whether another witness had lied.[2] *Id.* at 749. The First Circuit held

---

**2.** The full series of questions is as follows:

Q: So, I take it you would deny that you ever stated to Vaughn Stevenson that you wished you didn't have so many people involved in the robbery?
A: You take it I deny that?
Q: Yes.
A: I certainly do, yes.

Q: I take it that, when Vaughn [the witness] testified to that, you would say he was lying?
A: I'd say—
[Defense counsel]: Objection, your Honor.
. . .
The Court: Objection's overruled. He can answer. It's cross-examination.
A: Could I have the question again?

that "this type of questioning is improper." *Id.* The court declared "we state the rule now emphatically: counsel should not ask one witness to comment on the veracity of the testimony of another witness." *Id.* at 750. The court reasoned that "[i]t is not the place of one witness to draw conclusions about, or cast aspersions upon another witness' veracity." *Id.* (internal citations omitted).

Likewise in *United States v. Boyd*, 54 F.3d 868 (D.C.Cir.1995), the prosecutor asked the defendant over objection why the police witnesses would make up a story about him. *Id.* at 871. On appeal, the court held that this question "infringed on the jury's right to make credibility determinations." *Id.* The D.C. Circuit concluded that "[i]t is therefore error for a prosecutor to induce a witness to testify that another witness, and in particular a government agent, has lied on the stand." *Id.* (citing *Richter*, 826 F.2d at 208).

Our Circuit has reached an analogous result with a somewhat different fact pattern. In *United States v. Sanchez–Lima*, 161 F.3d 545, (9th Cir.1998), we concluded that it was reversible error to permit a Border Patrol Officer to testify over objection that "based on his training and experience, Agent Kermes [a witness who testified before the jury] was telling the truth" during his post incident interview. *Id.* at 548. We noted that "[t]his court has already held that opinion evidence regarding a witness' credibility is inadmissible." *Id.* (citing *United States v. Awkard*, 597 F.2d 667, 671 (9th Cir.1979) and *United States v. Binder*, 769 F.2d 595, 602 (9th Cir. 1985)).

Here, the prosecutor's questions compelled Sanchez to give his opinion regarding the credibility of a deputy marshal, which was error. We need not decide, however, whether the prosecutor's error in

offering evidence regarding a witness's credibility was plain, or by itself affected Sanchez's substantial rights, because we must reverse the judgment of conviction on other grounds.

B. *Eliciting a law enforcement officer's opinion whether a defendant gave truthful answers during an interrogation*

■ Sanchez also asserts that the prosecutor committed misconduct in his direct examination of Deputy United States Marshal Rod Ostermiller. Officer Ostermiller testified that Sanchez "didn't give us any information pertaining to Mr. Denton or his knowledge of even knowing him."

The redirect examination reflects the following proceedings:

### REDIRECT EXAMINATION

Q. (By Mr. Laws:) You say there was nothing gained out of this interview?

A. No, sir.

Q. And based upon your prior experience of having met Mr. Sanchez, you did not reveal that to him until the interview was finished?

A. That's correct.

A. And in light of that, what is your opinion regarding how truthful he was being to you on that day?

MR. ERREBO: Objection, calls for speculation.

THE COURT: Overruled.

THE WITNESS: Based on my opinion, no, he was not being truthful.

MR. LAWS: Thank you, your Honor.

THE COURT: You may step down and be permanently excused. Does the government rest?

Q: Vaughn Stevenson testified that you told him, while you were riding in his car shortly after the robbery, that you told him that you wished you hadn't had so many people involved in the robbery.
A: Uh-huh. And you want my opinion as to whether he lied?

Q: And you're saying—I take it you would say that that was a lie, that you never said anything like that.
A: You take that correctly, yes.
*Sullivan*, 85 F.3d at 750, fn. 2.

MR. LAWS: Government rests.

The prosecutor has not cited any authority to this court in support of the admissibility of one witness's opinion of the credibility of another witness's extrajudicial statements. As discussed above, we held in *Sanchez–Lima* that it is error to permit a witness to testify over objection that another witness's extra-judicial statements were truthful. 161 F.3d at 548. We cannot discern any principled distinction between asking a law enforcement officer his opinion regarding whether the defendant was untruthful during a police interview and the improper tactical ploy condemned in *Sanchez–Lima*. Eliciting the officer's opinion regarding Sanchez's credibility was misconduct.

C. *Admission of inadmissible hearsay statements of a third person through cross-examination*

■ Sanchez asserts that the prosecutor committed misconduct during his cross-examination by impeaching Sanchez with his wife's statement to the deputy marshals who investigated this matter. The record discloses the following colloquy:

Q. Now, you had all these calls from Steve Denton from Bozeman. You just testified that you never went to Bozeman?

A. I never went to Bozeman.

Q. Did you ever talk with your wife after April 12th, when she was talked to by the marshal's service about this matter?

A. I can't recall.

Q. Do you know why she would have told the marshal's service that you and Steve Denton went to Bozeman together three or four weeks before she talked—

A. I told her—well, when he called me from Bozeman I told her that's where he was and I might go to Bozeman.

Q. I see. But you really didn't. So she was just mistaken when she told the marshal's service that?

A. I didn't actually tell her I took him because I never.

Q. Now, you know your wife can't be made to testify against you, don't you?

A. Yes.

Q. The statement that she made to Deputy Marshal Fielder that you and Denton went to Bozeman together three or four weeks before she was being interviewed by them on April 12th was wrong?

Defense Counsel: I object to this line of questioning. She hasn't testified here. This is very improper. It wasn't introduced through Mr. Fielder's testimony.

Prosecutor: Impeachment. He testified that he didn't go to Bozeman.

The Court: Overruled.

Witness: What was that again?

Q. (By Mr. Laws:) I asked you that your wife would have been wrong if she told Deputy Marshal Fielder that you went to Bozeman three or four weeks before she talked with him on April 12th with Steve Denton?

A. I told her that he was in Bozeman because he called me, but, you know, he didn't really say, you know, for me to take him there. I never took him there.

Q. So your testimony is that she was as mistaken in what she told the marshal, or she was lying to the marshal, one of the two, if that's what she told him?

A. I—

Q. If that's what your wife told the marshal, she either was mistaken or she was lying to him; is that what you're saying?

A. She was probably mistaken.

It is clear from this exchange that the prosecutor was fully aware that he could not call Mrs. Sanchez as a witness to attempt to impeach Sanchez's testimony that he had not gone to Bozeman with Denton.

Furthermore, it is equally obvious that Mrs. Sanchez's statement to the officers was hearsay. No showing was made before the district court that Mrs. Sanchez's statement came within an exception to the hearsay rule, or that the statement bore sufficient indicia of reliability to overcome a constitutional confrontation clause challenge.

■ It is improper "under the guise of 'artful cross-examination,' to tell the jury the substance of inadmissible evidence." *United States v. Hall*, 989 F.2d 711, 716 (4th Cir.1993); *see also Goldsmith v. Witkowski*, 981 F.2d 697, 704 (4th Cir.1992) (prosecutor may not present inadmissible evidence through the "back door"); *United States v. Check*, 582 F.2d 668, 683 (2d Cir.1978) (prosecutor may not introduce inadmissible hearsay through "artful" cross-examination); *United States v. Simtob*, 901 F.2d 799, 805 (9th Cir.1990) ("[P]rosecutor's discussion of [prosecution witness's] remarks in relation to earlier statements which were not before the jury (and of which the jury could assume only the government was aware) could have implied that the government had certain knowledge whether [the witness] was in fact telling the truth."). As we have previously observed, "while prosecutors are not required to describe sinners as saints, they are required to establish the state of sin by admissible evidence unaided by aspersions that rest on inadmissible evidence, hunch or spite." *United States v. Schindler*, 614 F.2d 227, 228 (9th Cir.1980).

In *Hall*, the prosecutor also cross-examined the defendant over objection concerning the statements made by his wife to a prosecutor. 989 F.2d at 715. The Fourth Circuit held that the cross-examination was improper on several grounds. No evidentiary showing was made that the defendant's spouse gave a statement, whether it was accurate, or the conditions under which it was allegedly given. *Id.* at 716. The court also held that "[i]t was inadmissible as hearsay, thus violating Fed. R.Evid. 802, and perhaps, the confrontation clause as well, since Hall had no opportunity for cross-examination." *Id.* The same deficiencies in proof are present in the instant matter. In its responsive brief, the Government argues that Mrs. Sanchez's statements would have been admissible if offered "because they are supported by other evidence." The brief contains no citation to any evidence that demonstrates that Sanchez went to Bozeman with Denton. Furthermore, the prosecutor did not offer Mrs. Sanchez's extrajudicial statement into evidence. Accordingly, the cases cited by the Government that have held that a spouse's out-of-court statement can be received into evidence, notwithstanding the spousal privilege, where a showing has been made that the statement comes within an exception to the hearsay rule or contains sufficient indicia of reliability, are inapplicable. *See United States v. Chapman*, 866 F.2d 1326, 1329–31 (11th Cir.1989) (sufficient indicia of reliability); *see also United States v. Tsinnijinnie*, 601 F.2d 1035, 1037–38 (9th Cir.1979) (excited utterance); *United States v. Marchini*, 797 F.2d 759, 762–65 (9th Cir.1986) (grand jury testimony). We hold that the prosecutor's use of Mrs. Sanchez's alleged extrajudicial statement to impeach Sanchez was misconduct.

### D. *Prosecutorial Comment on the Assertion of the Marital Privilege*

■ During cross-examination of Sanchez, the prosecutor asked Sanchez if he was aware that his wife could not be made to testify against him. The prosecutor's question suggested to the jury the inference that if Sanchez's wife were to testify she would contradict his testimony.

We have previously observed that "[t]here is general agreement that it is improper to comment adversely on a defendant's exercise of the marital privilege, or to permit the jury to draw adverse inferences." *Tsinnijinnie*, 601 F.2d at 1039. *See also United States v. Tapia–Lopez*, 521 F.2d 582, 584 (9th Cir.1975) (improper for prosecutor to suggest that defendant's husband's testimony would be

favorable for the government where defendant held marital privilege to keep husband from testifying); *Courtney v. United States,* 390 F.2d 521, 528–529 (9th Cir. 1968) (improper for prosecutor to elicit testimony that defendant married to prevent wife from testifying). Other circuits are in accord. *See United States v. Golding,* 168 F.3d 700, 1999 WL 74558, *4 (4th Cir.1999) (improper for prosecutor to comment about wife not testifying when she has a privilege not to testify); *United States v. Morris,* 988 F.2d 1335, 1338–1341 (4th Cir.1993) (improper for prosecutor to ask defendant's wife whether she had invoked her marital privilege before the grand jury); *United States v. Chapman,* 866 F.2d 1326, 1334 (11th Cir.1989) (improper for prosecutor to comment on a spouse's assertion of the marital privilege); *United States v. Smith,* 591 F.2d 1105, 1111 (5th Cir.1979) (improper for prosecutor to argue that defendant's failure to produce his wife as witness created inference that her testimony would be unfavorable). *See also* 8 Wigmore, Evidence § 2243; McCormick, Evidence § 66 at 255 (4th ed.1992).

The Fourth Circuit, in *Morris,* analyzed this issue as follows: "[S]ince the marital privilege is recognized, the privilege should not be undermined by permitting the prosecution to gain an advantage with the jury by inferring that if the spouse's testimony were in fact exculpatory, the defendant would not be asserting the privilege." *Id.* at 1340. The court continued, "[t]o permit such an inference would destroy the privilege." *Id.* at 1341.

The Fourth Circuit also opined that "[g]iven that the marital privilege is one that remains vital in modern jurisprudence and has been sanctioned by Congress and the Supreme Court, it is apparent that we should guard against turning the privilege into an empty promise." *Id.* at 1339; *cf. Trammel v. United States,* 445 U.S. 40, 48, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (recognizing the important policy concerns surrounding the marital privilege and stating that "the long history of the privilege suggests that it ought not to be casually set aside"). Allowing the prosecutor to reveal in the presence of the jury that Sanchez's wife could not be made to testify against Sanchez improperly suggested to the jurors that they could legitimately infer that her testimony would be adverse to his defense. The prosecutor committed misconduct in revealing to the jury that he could not make Mrs. Sanchez testify as a witness for the prosecution.

E. *Impeachment by the Use of Evidence of Prior Bad Acts*

■ During cross-examination, the prosecutor asked the defendant the following question: "Can you explain to me Mr. Sanchez, why you have a reputation [for] being one of the largest drug dealers on the reservation but you don't have more than one source of supply?" The court sustained Sanchez's objection to the question. The Government admits that "this question perhaps went further than it should." It notes, however, that Sanchez was not required to answer the question and that the court in its closing instructions properly instructed the jury that "[s]tatements of counsel are not to be regarded as evidence." The Government also points out that this was the only attempt to ask Sanchez about his drug-dealing reputation.

The Government's responsive argument is unpersuasive. The question assumed facts not in evidence. No attempt was made by the prosecutor to show that he acted in good faith because he had witnesses available to prove the facts insinuated in the question. The question was not harmless to Sanchez's right to a fair trial because it suggested to the jury that the defendant had "a reputation for being one of the largest drug dealers on the reservation."

■ The prosecutor also improperly elicited testimony over objection that Sanchez was engaged in the distribution of a controlled substance after Denton was arrested. Sanchez objected that events after Denton's arrest were irrelevant to the is-

sues presented by his plea of not guilty. His objection was overruled. This testimony went beyond the scope of the court's pretrial order, which limited evidence of drug transactions between Sanchez and Denton to the time that Denton was a fugitive. The information elicited by the challenged line of questioning was not relevant to the charges against Sanchez.

### F. Prosecutorial Misconduct During Closing Argument

█ In closing argument, the prosecutor vouched for the Government's witnesses and denigrated the defense as a sham. He stated:

The difference here in the government's case and the defendants' case is this: In the government's case witnesses told a story and the marshal's service obtained and examined records. And the records verified the story that the witnesses had told to the marshal's service.

And the defense in this case read the records and then told a story to match the records. And, ladies and gentlemen, I'm going to ask you not to credit that scam that has been perpetrated on you here. And to find these two defendants guilty of the charges against them.

Later, in his rebuttal, the prosecutor vouched for the Government's witnesses and case even more strongly:

Steven Denton realizes that his obligation is to testify truthfully, and that is the only way he gets anything. And if not, what you need to believe, ladies and gentlemen, in this little case that the reputation of the [D]epartment of [J]ustice would be put on the line to solicit false testimony just to prove up a case against these two defendants. And I can tell you if the system doesn't work in this case, it won't work in any case, and the entire fabric of how this works would crumble.

He further stated:

Ladies and gentlemen, in order to find these defendants not guilty in this case, you have to discredit all of the testimony that the government witnesses gave to you, and you will have to believe what the two people who have the most to lose here have said happened, and you'll also have to believe that the records that were produced, pursuant to what the witnesses have told the government, have absolutely no bearing whatsoever on the proof in this case.

Finally, the prosecutor claimed that it was the jury's duty to find the defendants guilty. He argued:

And I would ask your consideration, as every jury has done, and that is that after the marshal's service has done their duty and the court has done its duty and lawyers on both sides have done their duty, that you as jurors do your duty and well consider this matter and find these defendants guilty.

Defendant's objection to this statement was overruled.

█ As noted above, credibility is a matter to be decided by the jury. *See Sanchez–Lima,* 161 F.3d at 548; *United States v. Barnard,* 490 F.2d 907, 912 (9th Cir.1973). "As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses." *United States v. Molina,* 934 F.2d 1440, 1444 (9th Cir.1991). It is improper vouching for the prosecutor to offer personal assurances of the veracity of government witnesses or to suggest that their testimony is supported by information not introduced as evidence. *See id.* at 1445. *See also United States v. Kerr,* 981 F.2d 1050, 1053 (9th Cir.1992); *United States v. Zehrbach,* 47 F.3d 1252, 1266 (3d Cir.1995). In *United States v. Richter,* 826 F.2d 206 (2nd Cir.1987), the Second Circuit pointed out that "prosecutors have been admonished time and again to avoid statements to the effect that, if the defendant is innocent, government agents must be lying." *Id.* at 209.

█ It is also improper for the prosecutor to state that the duty of the jury is to find the defendant guilty. *See United*

*States v. Polizzi,* 801 F.2d 1543, 1558 (9th Cir.1986) (improper for prosecutor to tell jury it had any obligation other than weighing evidence). There is perhaps a fine line between a proper and improper "do your duty" argument. It is probably appropriate for a prosecutor to argue to the jury that "if you find that every element of the crime has been proved beyond a reasonable doubt, then, in accord with your sworn duty to follow the law and apply it to the evidence, you are obligated to convict, regardless of sympathy or other sentiments that might incline you otherwise." Here, however, the prosecutor did not tell the jury that it had a duty to find the defendant guilty only if every element of the crime had been proven beyond a reasonable doubt. Nor did he remind the jury that it had the duty to acquit Sanchez if it had a reasonable doubt regarding his guilt.

The prosecutor committed misconduct in vouching for his witnesses, denigrating the defense as a sham, and arguing that it was the jury's duty to find the defendants guilty.

G. *Applicability of 18 U.S.C. § 201(c)(2) to Government Witnesses*

For the first time on appeal, Sanchez argues that this matter must be reassessed because Denton, John Thompson, and Braun were promised a reduction in their sentences in exchange for their testimony against Sanchez. He relies solely on the three-judge panel's opinion in *United States v. Singleton,* 144 F.3d 1343 (10th Cir.1998). That opinion was vacated when the Tenth Circuit ordered reconsideration en banc. In its en banc decision, the Tenth Circuit held that section 201(c)(2) does not apply to the Government in the prosecution of criminal offenses. *United States v. Singleton,* 165 F.3d 1297, 1300–01 (10th Cir.1999). We decline to consider this issue at this time because it has not been adequately briefed, and in view of the fact that the judgment must be reversed because of prosecutorial misconduct.

III

CONCLUSION

We are compelled to reverse the judgment of conviction in this case because the prosecutor committed misconduct in attempting to destroy Sanchez's credibility and in his argument to the jury. To obtain a conviction, the Government had the burden of persuading the jury that Sanchez did not tell the truth when he testified that Denton did not tell him he was a fugitive. In his effort to persuade the jury that Denton testified truthfully that he told Sanchez that Denton and Dana Jo Thompson had fled to avoid punishment for their crimes, the prosecutor relied on inadmissible hearsay and disclosed to the jury that Mrs. Sanchez had exercised her privilege not to testify against her husband as a prosecution witness. The prosecutor also improperly vouched for his witnesses in his argument to the jury, and told the jury it had a duty to convict.

The cumulative effect of these errors, when viewed in the context of the entire trial, compels a reversal in this case. We are persuaded that it is more probable than not that the prosecutor's misconduct materially affected the verdict. *See United States v. Christophe,* 833 F.2d 1296, 1301 (9th Cir.1987) ("[R]eversal is warranted only if it is more probable than not that the [prosecutorial misconduct] materially affected the verdict.").

REVERSED AND REMANDED.